## CHARLES KUGADT v. THE STATE.

### No. 1439. Decided March 2, 1898.

**1. Continuance.**

An application for continuance will not be granted for absent testimony which is immaterial, and it will be held properly overruled on motion for a new trial where the absent testimony coincides with the theory of the State.

**2. Conduct of the Trial—Excluding Crowd from Courtroom.**

On a trial for murder, where the evidence established that it was committed on barely sufficient for the witnesses and two venires that were present, it was not error for the court to have all other persons excluded to make room for said witnesses and venires.

**3. Murder—Proof of Venue.**

On a trial for murder, where the evidence established that it was committed on N. Y. Creek, and the body was brought to and cremated at J. Creek, and that both said creeks were in the county of W., the venue was sufficiently shown to be in W. County, where it did not appear said creeks ran also partly within the limits of other counties.

**4. Juror—Formed Opinion—Competency.**

Where a juror on his voir dire examination stated that he had expressed an opinion about the case in a jocular way, but that he could give defendant a fair trial, and he was not challenged for cause nor otherwise, though defendant's challenges were not then or afterwards exhausted; Held, defendant could not complain that said juror sat upon his trial.

**5. Confessions as Evidence.**

A confession to an officer is properly admitted in evidence where it is shown that the officer properly warned the defendant, and that afterwards the statements or confession were freely and voluntarily made by defendant to said officer. Nor is a confession rendered inadmissible from the fact that after it was made the officer told defendant that if he (defendant) testified on the trial what he had told him, he might get off with a life sentence.

**6. Examination of Witness—Practice.**

Where counsel, on the examination of a witness, has already gone over the same ground twice, it is not error for the court to refuse to permit him to go over it again.

**7. Argument of Counsel—Denunciation of Defendant as a Hyena.**

For the district attorney, in his argument, to denounce the defendant as "a hyena," should not be allowed in any case, and it is unfortunate he should travel out of the record to abuse or vilify a defendant on trial. But in this case, inasmuch as it is made to appear that as soon as exception was taken to the remark, the district attorney took it back and the court instructed the jury to disregard the same, it does not afford ground for reversal.

**8. Confessions—Special Instructions—Modification of.**

Where the defendant requested the court to instruct the jury: "You are instructed, that when the admission or confession of a defendant is introduced in evidence, the whole of such admission or confession is to be taken together, and the State is bound by them unless they are shown by the evidence to be untrue; and, unless the State has shown the statement of defendant as to how the killing took place, to be untrue, you should acquit him." Held, no error for the court, by modification, to add to said instruction, the following: "That such fact, like any other fact, may be proved by evidence direct or circumstantial."

**9. Special Instructions—Refusal of.**

It is not error to refuse special instructions where the general charge effectually covers so much of the requested instruction as embraced law pertinent to the case.

**10. Murder—Corpus Delicti—Confession.**

It is essential to a conviction for any degree of culpable homicide, first, that the deceased should be shown to have been killed; and second, this killing should have been proved to have been criminally caused by the act or agency of the defendant. Unless the corpus delicti in both these respects is proved, a confession is not, by itself, enough to sustain a conviction.

**11. Same.**

An extrajudicial confession standing alone is not sufficient proof of the corpus delicti. But a confession is sufficient if there be such extrinsic corroborative circumstances as will, taken in connection with the confession, produce conviction in the minds of the jury beyond a reasonable doubt. And such suppletory evidence need not be conclusive in its character.

**12. Same—Identification of Deceased—Circumstantial Evidence.**

Our statute, Penal Code, article 654, provides, that "no person shall be convicted of any grade of homicide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the fact of the death of the person charged to have been killed." This statute does not indicate the character of testimony by which the identity is to be established. Such identity may be established by circumstantial evidence, provided the circumstances leave no reasonable doubt of the fact. If only mutilated remains are found, it should clearly appear that they are those of a human being, and one answering to the age, sex, and description of deceased. And identification may also be facilitated by circumstances surrounding the remains, as apparel and articles found on the person. See facts stated in the opinion held sufficient to establish the identity of the deceased.

**13. Same—Proof that Death Was Caused by Act or Agency of Defendant —Flight.**

On a trial for murder, it is indispensable to a valid conviction to prove that the death of deceased was occasioned by the criminal acts or agency of the defendant. Such proof can be made by circumstantial evidence. See facts stated in the opinion which, though circumstantial in character, are held amply sufficient to establish the

fact that the death of deceased was caused by the violence of the defendant—these facts being emphasized by the further fact of defendant's flight, as soon as the remains were discovered, to California, where he was found, under an assumed name, several months afterwards.

APPEAL from the District Court of Washington.    Tried below before Hon. ED. R. SINKS.

Appeal from a conviction of murder in the first degree, the penalty being assessed at death.

The case is fully stated in the opinion.

*Letzerich & Felder,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death; hence this appeal.

As the principal questions presented involve the sufficiency of the proof as to the corpus delicti, we will summarize all of the testimony bearing on this subject.   The deceased, Johanna Kugadt, was an elderly maiden sister of appellant.   She came from California to live with him, at his home in Washington County, in the year 1893.   In the spring of 1894 she went to California on a visit to her relatives, and in the fall of the same year she returned to her brother's (appellant's), where she continued to reside until the time of her death.   Appellant resided on a farm in Washington County, about two and one-half or three miles west of the town of Washington, and about eighteen miles from Brenham.   By the direct route from the town of Washington to Brenham the distance is twenty-one miles; going by Whitman, which is a divergence to the south of the direct route from Washington to Brenham, is twenty-three miles; and going from Whitman by a still lower route, called the "Goodwill road," and thence west, back into the Washington and Brenham road, is about three and one-half miles further.   It is nine miles from Brenham to where the road to Rock Island leaves the Washington and Brenham road.   It is seven and one-half miles from Brenham to Kuykendall's Creek, three miles from Brenham to New Year Creek, four miles from New Year Creek to Earlywine's gin, seven miles from New Year Creek to Abner Roberts', three miles from Jackson Creek to Kugadt's house, and thirteen miles from Brenham to Jackson Creek.   These distances are mentioned, as it is important that they be stated, because the witnesses testify as to the defendant's being at these various points at different intervals of time.   The evidence shows that Miss Johanna Kugadt was possessed of some $400 to $600, which she had loaned out in the neighborhood.   Some weeks before she intended leaving for Europe, she, with her brother (appellant), collected in this money.   Her trip to Europe appears to have been contemplated for two or three months prior to the time of her supposed departure. In August appellant wrote to one Winkleman, at Brenham, with refer-

· ence to his sister's going to Europe, and desired to know about procuring
a ticket from Galveston to Bremen; and in September appellant and his
sister went to the office of the said Winkleman at Brenham to see him
in regard to said matter, and told him that they would purchase the
ticket from him from Galveston to Bremen. The letter of appellant
to Winkleman of August 22d is contained in the record; also a letter
from appellant to one B. H. Peters, at Galveston, of date October 14,
1896, in answer to a letter from Peters to appellant. From this letter,
it appears that appellant desired to know when the steamer Halle would
arrive and sail, and states to him that his sister will go by that steamer,
and desires to know where his sister can find him on her arrival at
Galveston. The proof shows that Winkleman never saw Johanna Kugadt
after the occasion above stated, and never sold her a ticket from Gal-
veston to Bremen. The record also shows that, preparatory to said
trip, appellant and his sister procured from one Henry Lehde an emi-
grant's box. It appears to have been made to order, and to have been
constructed, so far as the iron work was concerned, of peculiar materials.
There were iron pieces to protect or guard the corners, which were nailed
to the box, and also a number of iron hinges, fastened to the box with
nails. No lock, however, was attached to the box by Lehde, but ap-
pellant stated that he would put a lock on it. The box itself was
strongly made, three and one-half to four feet long, two feet wide, and
one and one-half feet high. This box was procured and paid for by
appellant on the 15th of October. Appellant gave out to several wit-
nesses that his sister would leave for Bremen on Monday, the 19th of
October, and that he would go as far as Galveston with her.

On Monday, October 19th, very early in the morning, appellant, driv-
ing a two-horse wagon, containing a trunk and a box, accompanied by
an elderly lady dressed in black, was first seen at Whitman, a little
country store about two miles from his residence, en route, as he stated
to the witnesses Buchanan and Ewing, to Brenham. At this point he
got out, and bought a bottle of whisky and some cigars, and resumed
his journey, taking the lower, or "Goodwill," road. Ewing told him
him that was one and one-half miles out of his way. He remarked that
he was going that way in order to avoid a bad place in the road. Ewing
hallooed to him that the place had been fixed, but appellant proceeded
on his way. Buchanan, who immediately left, going towards his home,
which was on the Goodwill road, overtook him before he had turned
off towards the Washington and Brenham road. About 8 o'clock Rich-
ard Mackey and George Isaacs met appellant in the road, driving his
wagon, with the before-described lady sitting by his side, and with a
trunk and box in the wagon. This was at a point near where the Rock
Island road leaves the Brenham and Washington road. A little later
than this, Mrs. Max Geisler, who lives on the Brenham and Washington
road at the Wilborn place, saw the defendant, and, as she says, "his
sister," pass her house, going in the direction of Brenham. She relates

that they had a trunk in the wagon bed behind them, and behind the trunk was a box. She describes the defendant and Johanna Kugadt, and says that she knew it was Johanna Kugadt, though it appears that she had never seen her before that morning. This was about 9 o'clock. Earlywine, who lives on the Washington and Brenham road, about seven miles from Brenham, and two miles west of Wilborn's, saw some parties pass his house in a wagon, going in the direction of Brenham. A little later Frank Wade, another witness, met the defendant in a wagon going towards Brenham, and about five miles from that point, with the same lady, trunk, and box. This was about two miles from New Year Creek, and near Abner Roberts' place on the Brenham and Washington road. This was the last witness who saw appellant en route towards Brenham, and the last person who saw his sister in the wagon with him.

About 1 o'clock p. m., defendant was seen going from the direction of Brenham and towards Washington. The first parties who testify as to having seen him were Henry Countryman and George Harbers. They testify, in substance, that they were in camp in New Year Creek bottom, some little distance from the road, and that appellant stopped his wagon some 150 yards from where they were camped, and walked towards their camp. He appeared to be eating something, and one of them states that he was eating a piece of turkey, and asked for some water. He drank some coffee with them, and remained there some thirty or forty minutes, when he went back to his wagon, and proceeded on his journey in the direction of Washington. He drove across a dump, which brought him within forty or fifty yards of one of the witnesses, and he states that he was driving towards Washington by himself, that he had a box or trunk in the wagon with him, and it was between 1 and 2 o'clock in the afternoon; that it was an old top box or trunk. Thomas Harbers, who was at Earlywine's gin, saw him pass said point on his return about 2 o'clock in the afternoon. No one was with him. W. H. Wade, who lived three miles west of Jackson Creek, on the Washington and Brenham road, nine miles from Brenham, saw defendant pass his house on the Monday evening, driving a wagon by himself, and that a box or trunk was in the wagon. West Baber, the next witness who saw the defendant on his return, met him about Jackson's Creek (the creek on which the body was subsequently found). Appellant then appeared to be very warm and thirsty, and gave witness a dime to get him some water. When they approached Mrs. Lawson's house, witness went in to get appellant some water. Appellant followed him, and drank a great deal of water, claiming to be very thirsty. This witness noticed blood in the bed of the wagon. He states: "I overtook Mr. Kugadt near the creek. He passed me twice on the road. The first time I got the water for him, and the second time I stopped to talk to Sister Chase. The spots were in the bottom of the wagon, and on the right-hand side of the back. I saw no grease spots. It was blood."

William Hogan and Mitchell Scurry saw defendant still later on his. way home. Mitchell Scurry, the last witness who met him, states that he was going towards home in a wagon, had a large oval-top trunk, said he had taken his sister to Brenham, and she had gone to Galveston, that. Langhammer and he had a fine time at Brenham, and that he had brought the trunk back for Miss Dill. Two or three witnesses testify to having seen a large fire above the road and in Jackson Creek bottom on that Monday evening, and one witness testifies to having seen a wagon and part of one horse near the fire, but did not go any closer, and did not see any man there, and that it was a big fire in the bottom. Appellant gave out after his return home, within the next day or two, that he had carried his sister to Brenham, and sent her to Galveston, en route to Europe; that he did not go with her to Galveston himself, as he intended, but that he had placed her in charge of Prof. Krueger. Prof. Krueger was introduced as a witness, and testified that he was not at. Brenham at the time, did not see defendant, nor did he go with Johanna Kugadt to Galveston.

On Thursday, the 22d of October, some time in the evening, one Lem Harris was hunting hogs in Jackson Creek bottom, and about 400 or 500 yards to the left of the Washington and Brenham road, up the creek, and about 150 steps from the creek, in a brush heap, he discovered the charred remains of a human body. He also narrates that, going up the bed of the creek to a point opposite where the body was found, there appeared the tracks of a wagon going up to that point, and thence returning. This witness describes the condition of the body, and the remains on the fire. He says he saw hinges, and crooked irons, and a piece of dress, hairpins, hatpins, and a piece of a corset; and a coil of hair was burned into a coal. About two dozen hairpins were found in the coil. There were some buttons and feathers. Here a number of articles. were shown witness, and he identified them as being the same as those found at the place of the fire. He narrates that the skeleton was complete; the cheeks were burned, but had not fallen in; the skeleton was altogether not cracked, nor anything broken about the face or head, but some places burned to ashes; he lifted the skeleton up by the head. The backbone seemed to be about three feet long; that he immediately went after one Hogan, and, as soon as he got him, sent for the magistrate.. Witness also identified the lock found there, and three or four crooked irons, and two hinges.

R. G. Moore, the magistrate, testified: That he came at the instance of Lem Harris. That the remains were beside a log, and that you could see signs where the parties had picked up logs for the fire. The skeleton was. perfect down to the knee joints. The foot parts were turned towards the head. This witness also identified hinges, nails, irons, hair pins, buttons, feather, and lock as the same found with the skeleton. That he held the inquest on the 22d of October, 1896. That he never saw Kugadt after that. That Dr. Brewer, whom he sent for, came there, but did not give in his testimony at that time. Witness identified and

counted out the articles which were exhibited to him, as follows: Twenty nails, three screws, twenty-four hair pins, one hat pin, three pieces of crooked iron, and one lock. He said that he had seen boxes bound like the one found. "Locks like the one produced are not used on trunks and boxes as a general rule."

Dr. Brewer states that he examined the skeleton, and "that it was the body of a female. The joints were hard. The ball and socket joints were not turned around. The head of the body was lying southwest. I lifted the skeleton up, and saw that all of the hair, skin and flesh were burned off the head, and it was badly parched. The head was not crushed; it was perfect. The spinal column was not broken. Could find nothing on face, head, or body that indicated violence. Found the heart, liver, and a womb. The frame of the body was small." Witness said: That he knew Kugadt, but never saw him after the body was discovered. That the place looked like there had been a very large fire there. "That the ribs were badly burned, but were in position. The legs were badly burned, but were in position. The bones, from the hip to the thigh, were badly burned, almost to ashes. The knee joints were burned apart. The pelvic bones were very badly burned, not enough to be apart, except the front part. It was shelled from the outside. There are six or eight bones in the pelvis. They are the ischium, ilium, and coccyx. I can't name the rest—have forgotten them. The male pelvis is not so round as the female. I can not mention the exact measurements of a female pelvis. You must have all the parts of the pelvis to tell the difference between a male and a female pelvis. I found all the pelvis bones, but I can not name them. The largest bones in the body, I think, are the pelvis bones—not always. I found a womb. The coverings of the abdominal cavity are muscular tissue, three or four, skin, and the peritoneum. I don't remember the rest. Can not tell the thickness of the covering of the abdominal cavity in an average person. The uterus was cooked, and was shrunk. In an average uterus, the weight would be from four to five ounces; the dimension is three inches long and one and one-half inches wide. The pubes were shelled off, but the womb was intact. The womb was protected by the spinal column."

Two witnesses testify that they saw the remains of a burned trunk near the house of Kugadt, some 150 or 200 yards therefrom, in a ravine; and two witnesses (besides the ones previously mentioned) testify that they saw the appearances of blood in the bed of the wagon some few days after the inquest was held.

The testimony shows that, as soon as publicity was given to the discovery of the body (which was immediately), the appellant disappeared from his home. He was sought for assiduously, but could not be found by the neighbors or officers. He was not to be found at home. Some three months after this, appellant was arrested at Napa, Cal., and at that time was under an assumed name. He was extradited, and brought to Texas by D. E. Teague, the sheriff of Washington County. Teague testified that he duly warned appellant, as follows: "I warned him that

any statement he made to me about the transaction could be used in evidence against him, and that I would be called upon in the case to testify, and that he had better not make any statement to me that would in the least criminate him, and that he ought to know that any statement he might make could be used against him on the trial. I also told him he could tell me anything he wanted to, but that everything he said could be used against him. I also told him that 'I don't want you to tell me anything, unless you do so freely.' He then told me that he was glad I came after him, that he intended to write to me to come after him, and that he was glad to see me, and wanted to come home with me. I never made him any promises, or advised him what to do. He then went on and gave me a full history of the whole transaction. He made the statement to me on the train, while I had him in custody. He made the statement to me in California, and also in Texas, after I had warned him." He then told the sheriff: "That he saw John Ewing and Sam Buchanan at the store at Whitman. That he got as far as New Year Creek bottom, about three miles east of Brenham, where he and his sister stopped, ate lunch, and fed the horses; and when they were about ready to start to Brenham, he was picking up the fodder left by the horses, and his sister attempted to climb into the wagon, and that she stepped on the front wheel, and the horses gave a sudden start, and she fell on the ground and the hind wheel of the wagon passed over her head and jaw, breaking her jaw; and that he ran to her, and asked her if she wanted some water, and that she said, in German, that she was badly hurt, and could travel no further. That he brought her some water, and he found blood running from her mouth and nose. That he then spread out a quilt in the bottom of the wagon, and placed her on it, and put a pillow under her head. He then wet a towel with water, and put it on her face. He then started back to go to a house, a friend of his, which was near by, and after he had driven into the pasture a short distance from the public road he noticed that she was dead. He became excited, and returned to the road, and did not go to his friend's house. He then concluded he would go back home. He then covered her up with a quilt, and intended to take her home, but he became frightened, for fear some one would think he had killed her. That he went back to the Brenham and Washington road, towards his home, and when he got to Jackson Creek bottom, he drove up into the woods from the road, intending to bury the body and burn the things. And after he had started the fire, he burned the chest, and that he laid her down on the ground, intending to leave her there; but he thought that her body might be discovered, and he picked her up and threw her on the fire. And he then intended to burn the trunk, but in pulling it out of the wagon he fainted, and did not know how long he laid on the ground after he fainted; but when he recovered he was too weak to burn the trunk. He then got in the wagon, drove back to the public road, and, as he crossed Jackson Creek, West Baber overtook him, and Baber gave him some water. When he got home, he put the trunk in a gully near the house, and next day burned

it." He further said that "he had nothing to dig a place to bury her at New Year Creek bottom; that he first thought he would burn her clothing, and leave her body there. He also said that some of the money she had was burned—that he got about two hundred dollars. That was all he said, so far as I remember, about the money. He also said that William Bynum told him he ought not to go over to Dr. Brewer's, for Dr. Brewer was against him. This he said on Thursday, or perhaps Wednesday night. He said he put her head over the hind axle on the right side of the wagon, with her feet towards the seat, and that the body was in the wagon when he passed Countryman and others at Kuykendall Creek; that he also went on the following Thursday evening to see Dr. Brewer, but he was not at home, and Mrs. Brewer told him that the body that was found on Jackson Creek was the body of a white woman; and that as he was coming back from Brewer's was when he met William Bynum, who is now dead; and it was there Bynum told him that Dr. Brewer was hot against him." He further said, "that when he left home, and got into the woods, he shaved himself with a shoe knife, while he was hiding in the woods, and that when he was in California he changed his name to John Frey." He said "that he wandered through the bottom for several days; that he finally reached Somerville, and afterwards went over to Wilborn, intending to take the train there; that it was a flag station, and the train did not stop. He then went to Dallas and bought a paper, and saw that he was charged with the crime and that a reward was offered for him. He then took the train and went to California." This was, in substance, all the testimony adduced by the State.

Appellant shows, on the cross-examination of the witness Dr. Brewer, and also by Dr. Barton, that the effect of a wagon wheel running over the head would ordinarily cause concussion of the brain and hemorrhage of the eyes, ears, nose, and mouth. It is possible, under such circumstances, that a person might live a short time and be able to speak. Dr. Barton also testified that persons might be overcome on account of an accident happening to some near and dear one, for the time being lose their minds, and do ridiculous things. A number of witnesses testify to the kindly relations existing between defendant and his sister, and also a number testified to the good reputation of appellant, as being a peaceable and law-abiding citizen. He also offered some testimony to the effect that he had some money of his own. One witness testified that on one occasion in September he paid him $10, and saw $7.50 paid to him. Langhammer testified that about the 1st of October he paid defendant something less than $50.

Before discussing the corpus delicti, we will notice some other assignments of error. Appellant complains that the court erred in refusing to change the venue on his application. Issue was joined upon this matter before the court, and evidence was heard pro and con. It does not appear to us that the court abused its discretion in overruling said mo-

tion, nor does it occur to us, as presented in appellant's motion for a new trial, that the court should have changed the venue on his own motion.

Appellant assigns as error the action of the court in overruling his motion for a continuance, and this is made one of the grounds of the motion for a new trial. The motion was based on the absence of a number of witnesses. However, appellant only relies on the absence of Mrs. Dill and J. Lenorowitz of Washington County, and Jesse Lott of Grimes County. By Mrs. Dill, appellant proposed to show that he superintended her business and handled large sums of money for her. It is not shown when this occurred, and, as presented, we do not regard it as material. By Jesse Lott, it was proposed to show that said witness paid defendant certain sums of money on October 15, 1896, and that this is a part of the money seen in the possession of the appellant after the deceased is alleged to have been killed. In answer to this, it is sufficient to state that an amount of money is not shown to have been in the possession of the defendant after the homicide. By Lenorowitz, appellant states that he expected to prove that he passed appellant and his sister, Johanna Kugadt, on Monday, the 19th of October, 1896, and saw them lunching in New Year Creek bottom, and that the road was a public thoroughfare, and at a place not affording concealment for a murder. This testimony coincides with the theory of the State. We fail to see how it could have been of any benefit to appellant.

As explained by the court, nothing occurred during the trial that would indicate that appellant did not have a fair and impartial trial. The exclusion by the judge of the crowd is satisfactorily explained. As shown by him, the court room was barely sufficient for the witnesses and two venires that were present on that occasion, and the others were excluded to make room for them. He further shows that there was nothing like a mob present, and nothing to indicate such.

The contention of appellant that the venue was not sufficiently shown is equally without merit. The proof shows unequivocally the location of New Year Creek and Jackson Creek to be in Washington County; and the murder evidently occurred at New Year Creek bottom, and the body brought and cremated at or near Jackson Creek. These creeks, as stated, are both shown to be in Washington County; and, in the face of the proof, it will not be presumed, as appellant insists, that all of said creeks were not contained in the county.

Nor does it occur to us that there is anything in the objection of the appellant to the juror McIntyre. On his examination as a venireman, he stated to counsel that he had expressed an opinion about the case in a jocular way, but that he could give the defendant a fair trial. He was not challenged for cause, nor otherwise, though defendant's challenges were not then or afterwards exhausted.

We do not think any error was committed by the court in admitting the testimony of D. E Teague as to the confessions made by defendant to him. His testimony shows that he duly warned appellant before he

made any statements, and that said statements were freely and voluntarily made to him after such warning, both in California and in Texas. Nor did the court err in refusing to permit counsel to continue to interrogate the witness Teague on this subject. The explanation to the bill of exceptions made by the court shows that counsel traversed the same ground with the witness twice, and the court refused to permit him to go over it again. The witness did not state at any time to the defendant that he would get a light sentence if he would make a confession, but he did state that he told defendant, after he had confessed to him, that if he testified on the trial what he had told him that he might get off with a life sentence.

It appears that, during the argument, the district attorney alluded to the defendant as a "hyena." On exception, this remark was taken back, and the court instructed the jury to disregard the same. We can not regard it but as unfortunate in any case when an officer prosecuting shall travel out of the record to abuse or vilify a defendant on trial. This is not the first occasion we have been called upon to animadvert on the remarks of the district attorney (Maynard) who prosecuted this case. We can not refrain from insisting that the court below should take steps to prevent a recurrence of this character. Such denunciatory terms should not be allowed in any prosecution. But, as presented here, it does not afford ground for reversal.

Appellant excepted to the action of the court in modifying or adding to the special charge requested by him on the confession of appellant. The charge requested was as follows: "You are instructed that, when the admission or confessions of a defendant is introduced in evidence by the State, then the whole of such admission or confession is to be taken together, and the State is bound by them, unless they are shown by the evidence to be untrue; and, unless the State has shown the statements of defendant as to how the killing took place to be untrue, you should acquit him." The court added to this requested instruction the following: "That such fact, like any other fact, may be proved by evidence, either direct or circumstantial." It occurs to us that there was no error in this procedure on the part of the court. The requested charge was certainly very liberal to the defendant; nor could he object that the jury, in that connection, were told that the falsity of the explanation could be proved by direct or circumstantial evidence.

Appellant asked the following charge to be given to the jury: "You are instructed that the State must prove with particular clearness and certainty, and beyond a reasonable doubt, the fact of the death of Johanna Kugadt, and that her death was caused by the criminal agency of Charles Kugadt, and that a confession of defendant is not, of itself, a sufficient proof of this part of the corpus delicti." The court refused to give this charge, and appellant reserved his bill of exception. The fourteenth subdivision of the charge of the court, in our opinion, effectually covered so much of the charge requested as was law and pertinent to this case.

Now, with reference to the corpus delicti, and recurring to the summary of the facts heretofore stated, we would observe that the rule of law is well settled that, before a conviction can be maintained in any criminal case, the corpus delicti must be established. In a case of culpable homicide, Mr. Wharton says: ".It is essential for a conviction for any degree of culpable homicide—first, the deceased should be shown to have been killed; and, second, this killing should have been proved to have been criminally caused. Unless the corpus delicti in both these respects is proved, a confession is not, by itself, enough to sustain a conviction." Whart. Hom., sec. 641. See also Hunter v. State, 34 Texas Crim. Rep., 599, and authorities there cited. We would further observe, in this connection, that, before a person can be convicted of felonious homicide, the death of the deceased must be shown to have been caused by the act or agency of such party; and in this State it is enacted by statute that "no person shall be convicted of any grade of homicide, unless the body of the deceased or portions of it are found and sufficiently identified to establish the fact of the death of the person charged to have been killed." See Penal Code 1895, art. 654. Now, it will be noted that, while the statute requires that the body of the deceased, or portions thereof which are found, must be sufficiently identified to establish the fact of the death of the person alleged to have been killed, yet there is no attempt to indicate the character of testimony by which the identity of the person is to be established. The statute says that the remains must be sufficiently identified; that is, we take it, the statute requires that the proof be of a legal character. Nowhere is it said that the testimony must be positive. If it be circumstantial, that is all that is necessary if it sufficiently identifies the remains or the portions thereof found as those of the deceased. See Taylor v. State, 35 Texas, 97; Wilson v. State, 41 Texas, 320, 43 Texas, 472; Brown v. State, 1 Texas Crim. App., 154; Jackson v. State, 29 Texas Crim. App., 458; State v. Davidson, 30 Vt., 377; McCulloch v. State, 88 Ind., 109; State v. Williams, 52 N. C., 466, reported in 78 Am. Dec., 248, and note 2, at page 253; Campbell v. People (Ill. Sup.), 42 N. E. Rep., 123; State v. Martin (S. C.), 25 S. E. Rep., 113; Webster v. Com., 5 Cush., 386; 1 Bish. Crim. Proc., sec. 1057 et seq.

The above cases not only show that the body or portions thereof may be identified as that of the deceased by circumstantial evidence, but the corpus delicti itself may also be proved by this character of testimony. In Martin's case, supra, the proof of identity was established in very much the same way as that pursued in the present case. The body of the deceased, when found, had been burned beyond recognition; but it was identified as that of the deceased by the size, some buttons, buckles, pieces of clothing, collar button, and slate pencil—some of which were shown to resemble articles belonging to the deceased. In Williams' case, supra, the deceased was a woman, and, as a circumstance to identify the charred remains found as those of the deceased, certain hair pins were introduced in evidence, and it was proved that she was in the habit of wearing such

pins. In McCulloch's case, supra, it was also shown that the skeleton found was of the sex and size of the person charged to have been murdered; and this, in connection with the other circumstances, was held sufficient to identify the skeleton as that of the alleged murdered person. And the same method of identification was resorted to in the Wilson and Jackson cases, supra. Mr. Greenleaf (volume 3, section 133), on this subject, uses the following language: "But, though it is necessary that the body of the deceased be satisfactorily identified, it is not necessary that this be proved by direct and positive evidence, if the circumstances be such as to leave no reasonable doubt of the fact. Where only mutilated remains have been found, it ought to be clearly and satisfactorily shown that they are the remains of a human being, and of one answering to the sex, age and description of the deceased. The agency of the prisoner in their mutilation, or in producing the appearances found upon them, ought to be established. Identification may also be facilitated by circumstances apparent in and about the remains, such as the apparel, articles found on the person, and the contents of the stomach, connected with proof of the habits of the deceased in respect to his food, or with the circumstances immediately preceding his dissolution."

Now, the first question that presents itself to us is whether or not the remains—that is, the portions of the skeleton found on Jackson Creek—were the body of Johanna Kugadt. There is no question but that the remains found were those of a human being—of a female; the skeleton answering the general description of Johanna Kugadt. This is made certain by the testimony of Dr. Brewer, an expert, and is supported by other evidence found on the ground and at the place where the body was cremated, to wit, pieces of corset, hair pins, a coil of hair, hat pins, and the iron fastenings, answering the description of those that had formerly been on her traveling chest. The remains, when found, had evidently been recently cremated; portions of the flesh still adhering to the bones. These remains were found on the route pursued by defendant and deceased (as she returned with him) on their journey from New Year Creek, some three miles from Brenham, towards their home. She was last seen alive on Monday, in the company of appellant; and these remains were discovered, in the condition above stated, on Thursday of the same week. This testimony, in connection with the other circumstances of the case, together with appellant's confession, afforded ample proof that said remains were those of Johanna Kugadt.

The remaining question, and the one fraught with the most difficulty, is, did Johanna Kugadt, the deceased, come to her death by some criminal means or agency, and was this criminal means or agency the act of appellant? the rule being that in every criminal prosecution, before a conviction can be had, the State is required to prove two things: First, that a crime has been committed (in this case the death of Johanna Kugadt by some criminal agency); and, second, that her death was caused by the person (appellant) charged, and none other. There is some conflict in the authorities as to whether or not the corpus delicti can be

proved by circumstantial evidence, but the great weight of adjudicated cases is in favor of the proposition that it can be done. But when proof of this character is relied upon, the evidence should be clear and strong, fully complying with the rule laid down with regard to the proving of a case by circumstantial evidence. The general doctrine is that extra-judicial confessions, standing alone, are not sufficient proof of the corpus delicti; and some of the cases hold that the corpus delicti must be proved independently of confessions. But we do not understand such to be the better doctrine. In other words, in the establishment of the corpus delicti the confessions are not to be excluded, but are to be taken in connection with the other facts and circumstances in evidence. See note 3 to case of State v. Williams, reported in 78 Am. Dec., p. 254. And this rule is recognized in this State. See Jackson v. State, 29 Texas Crim. App., 458. Said case quotes with approval an excerpt taken from 4 American and English Encyclopedia of Law, p. 309, as follows: ".A confession is sufficient, if there be such extrinsic corroborative circumstances as will, taken in connection with the confession, produce conviction of the defendant's guilt in the minds of a jury beyond a reasonable doubt." "Such suppletory evidence need not be conclusive in its character. When a confession is made, and the circumstances therein related correspond in some points with those proven to have existed, this may be evidence sufficient to satisfy a jury in rendering a verdict asserting the guilt of the accused. 'Full proof of the body of the crime, the corpus delicti, independently of the confessions, is not required by any of the cases; and in many of them slight corroborating facts were held sufficient.'" 3 Am. and Eng. Enc. of Law, p. 447. We take it that there can be no question that the prosecution is permitted to prove by circumstantial evidence the corpus delicti, and in aid thereto use confession of the appellant.

Now, to restate: A dead body, or its remains, having been discovered and identified as that of the person charged to have been slain, the basis of the corpus delicti being thus fully established, the next step in the process, and the one which is to complete the proof of that indispensable preliminary fact, is to show that the death has been occasioned by the criminal acts or agency of another person. See Burrill Circ. Ev., p. 682. Now, as stated above, this proof can be made by circumstantial evidence. In this case, the dead body of Johanna Kugadt, which, we have seen, was sufficiently identified, was found. That she came to her death by violence, aside from other testimony in the case, is suggested by the fact that, after defendant passed Jackson Creek, the point where the evidence shows the body was removed from the wagon, blood was seen in the bed of the wagon. This would indicate that her death was caused by violence. This, however, would also accord with the theory, set up by appellant in his confession, that she came to her death by a violent accident. The body itself was partially consumed by fire. No marks of violence were found thereon. Her death, however, could have been caused by violence in many ways without leaving any marks upon the

portions of the skeleton found. Upon this point it is much like the Webster case. It will be remembered that in the Webster case no marks of violence were found on the remains of Parkman, nor were any weapons or implements found in the room in which the body was consumed and shown to have been used in inflicting violence upon Parkman. The fact that Parkman had been killed by some person other than himself was established by circumstances of a different character altogether. That the deceased in this case came to her death by violence is not gainsaid by appellant. To give his version of the matter, he says: That she met her death by an accident. That, en route to Brenham, they stopped in New Year Creek bottom for lunch, and, when they were about getting ready to start, she attempted to get in the wagon. The team made a start at that juncture, and she fell. The hind wheel of the wagon passed over her head and jaw, breaking her jaw. That he ran to her, and asked her if she wanted some water. That she said she was badly hurt, and could travel no further. That he brought some water, and found that blood was running from her mouth and nose. He then spread a quilt in the bottom of the wagon and placed her on it, and started back to a house near by, and, after he had driven into the pasture a short distance, noticed that she was dead. That he then became excited, concealed her body in the wagon, and started home with it, and on the way cremated it in Jackson Creek bottom. Now, aside from this confession of appellant, we understand the proof establishes the identity of the remains of Johanna Kugadt; but certainly, with this addenda, this matter, to wit, the identity of the body found as being that of the deceased, is placed beyond controversy, and we have also seen that she came to her death by violence. Now, the issue as tendered by the statement of the defendant—and it is made very sharp—is, whether the deceased received the mortal wound by the wheel of the wagon or by appellant. He says by the "hind wheel." All other accidents are excluded. The question, therefore, is, did the defendant kill the deceased, or was she killed by the wheel? It will be noticed in connection with his statement, that as soon as the remains were discovered he fled, and several months afterwards was found in California. When he stated how her death occurred, he believed at that time that her remains were entirely cremated, and that his statement could not be gainsaid or disproved by any physical facts connected with the skeleton; and so he told the officer that the wheel ran over her face and broke her jaw. Now, if this had been found to be true by an inspection of the skeleton, it would have been a circumstance corroborative of him, and very strongly in his favor; but the head of the skeleton was found intact, and the jaw not broken, nor was there any mark of violence upon any of the bones. Mr. Burrill lays down the rule that "the falsity of statements or explanations made by accused parties, under examination or interrogation, is often made more or less apparent by their intrinsic improbability. This is particularly exemplified in cases where causes are attempted to be assigned for an obviously violent death, or where the accused undertakes to relate the particulars

of the death as it occurred in his presence." And he cites Greenacre's case, where accident was the cause of death assigned: "The prisoner's statement, as made after his arrest, was ingenious and plausible, being to the following effect: That, while the deceased was in his house one evening they had an altercation, and that, during the conversation, the deceased was moving backwards and forwards in her chair, which was on the balance; that he put his foot to the chair, when she fell back with great violence against a block of wood; and that, finding life extinct, he made up his mind, in the alarm of the moment, to conceal her death, and get rid of her remains, which he effected by dismembering the body and scattering the parts about in different places." See Burrill Circ. Ev., p. 491.

It was shown on the trial that the death could not have happened in this accidental manner. This account of the manner of her death, shown by an inspection of the skull of the deceased to have been false, we consider a very strong criminative circumstance against appellant, and goes far towards destroying the hypothesis on which he placed his defense; that is, that her death occurred by an accident. In this connection we would also recur to his extraordinary conduct in connection with the death of his sister as related by him. He states that when it occurred he became excited, and that he first started with her remains to a friend's in that vicinity, and that when he found she was dead he changed his mind and concluded to carry her remains home. On the way, he again changed his mind, and concluded to cremate her remains, and he sought a secluded spot in order to accomplish this purpose. This is all explained by him on the ground that, when he found she was dead, he became apprehensive that her murder would be attributed to him. But it will be borne in mind, in this connection, that shortly after the time when the accident occurred, according to his statement, he approached a camp in New Year Creek bottom, stopped and chatted with the persons there, ate a piece of turkey and drank a cup of coffee. No evidences of undue excitement were then apparent to the witnesses. And, moreover, on the entire trip from there to Jackson Creek, some seven or eight miles, though met by several witnesses, no indication of undue excitement was apparent to any of them. Yet, according to his statement, he was overcome by the accident to such an extent as to be deprived of his ordinary sanity, and was rendered apprehensive that her death would be charged to him. We fail to comprehend, in the absence of a guilty conscience, how appellant should have suddenly become overwhelmed with the thought that he would be accused of the murder of his sister. So far as the testimony indicates, their relations were entirely agreeable, and he was then en route with her to Brenham in order that she might embark for Europe. Again, it may be asked, why did he resort to the concealment of her body? Is this consistent with innocence, or is it explained on the theory that he was deprived of his reasoning powers by excitement? The books lay it down that concealment, if not anticipated beforehand, is one of the immediate resorts after the perpetration of a

crime. "The murderer feels himself, and knows, that the ministers of justice will soon be on his track. Some of his precautions to baffle or elude them have just been enumerated. Henceforth, in short, the whole object of his life is concealment, either of his crime or of his own person. To attain this, he will make any sacrifice. To hide the body of the slain, he will, though utterly unused to manual labor, toil for hours at the most revolting drudgery, denying himself rest and food. To conceal himself, he will undergo almost any amount of personal suffering. Supposing, however, this great object to be frustrated, and that he falls at last into the hands of his pursuers, even in the actual grasp of the law he does not lose sight of his determined policy. He assumes the air, the demeanor, and the language of innocence, resolutely and perseveringly repels the charge of guilt, or wraps himself up in impenetrable silence." Burrill Circ. Ev., p. 125.

Another strong circumstance, indicative of guilt, is made manifest from this record. It was in evidence that the deceased, when she started for Brenham en route to Europe, had $400 to $600 on her person. According to appellant's own confession, he got at least $200 of this money; and how much more we are not informed. Evidently if, amid his excitement, he was thoughtful enough to take from her this amount, we can well conceive that he took from her all her money. The motive of gain is a powerful impellant towards the commission of crimes, of which the records of the criminal courts afford ample testimony; and even relationship has not been found a sufficient deterrent against human greed. Cases have occurred in which the tenderest ties have afforded no safeguards against murder, where the object has been gain. See Burrill Circ. Ev., pp. 306, 321. Appellant attempted to rebut this idea by showing that he had money of his own. But it is remarkable how flimsy the proof was on this line. In this connection, we would observe that, notwithstanding the relationship of brother and sister existing between them, and she living at his house, he is not shown to have had any control over her finances. She managed her money affairs herself. That he had money after this homicide is manifest, for he had means with which to make his flight from Texas to California. This circumstance of flight, too, is a strong incriminative fact, in connection with other facts in this case. When the first faint breath pervaded the neighborhood that the remains of a person had been found in Jackson Creek bottom he fled incontinently, and in his flight disguised himself by shaving his whiskers. He was not contented with seeking some secluded spot in the vicinity, where he could conceal himself until the excitement might subside; but he fled the State, and secluded himself in California, and disguised his identity by changing his name. All these facts and circumstances do not agree with the accident, as claimed by him, through which his sister lost her life. We are not compelled to take his statement as true, but we try it according to the known rules of testimony, and we try his conduct in that connection with the known rules of conduct in human experience. It may be true, as testified by one of the witnesses,

that an accident happening to a near and dear one will unnerve a person, and cause him to do some curious things. But it is a most extraordinary circumstance, if it be true that Johanna Kugadt met her death as related by him, that it should have occurred to him that he would be charged with her murder, notwithstanding the kindly relations that hitherto existed between them—that he should at once set about destroying her remains. He carried her body a considerable distance along the road, concealing it in the wagon, and then adopted the most effective and inhuman method within his power to entirely destroy all vestige of her remains. So far as we are advised, he failed to inform any member of his family of the terrible accident that had befallen his sister, and gave out in the neighborhood that she had gone on her journey to Europe, and that he had placed her in charge of Prof. Krueger, which statement was subsequently shown to be false. In our opinion, the facts in proof give the lie to his statement as to how her death occurred. They are in accord with common experience as to the conduct of criminals, who are endeavoring to obliterate the footprints of their crimes, and who are seeking to destroy all evidence of their guilty agency in the transaction, and point with unerring certainty to the appellant's guilt. In other words, the facts and circumstances in proof are not only inconsistent with his statement as to how her death occurred, but they are only consistent with his guilty agency in causing her death; and thus they fulfill the rules required as to the proof of the homicide by circumstantial evidence.

In our opinion, the circumstances of this case identify the remains found as those of Johanna Kugadt, and they establish beyond any reasonable doubt that the appellant, by some means not disclosed in this evidence, murdered his sister while journeying with her to Brenham, under pretense of sending her to Europe, and that he did this for the purpose of robbing her of a few hundred dollars, which she is shown to have had at that time. The court gave appellant a fair and impartial trial, presenting every issue in the case arising from the evidence. The jury have found him guilty of murder in the first degree, and in our opinion the evidence amply sustains their verdict, and the judgment is affirmed.

*Affirmed.*

HENDERSON, Judge, concurs.

DAVIDSON, JUDGE.—I agree to the conclusion reached, but do not agree to all the reasoning of my brethren on the question of corroboration. I believe the facts sufficient in this case.

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]