LEONARD BROWN V. STATE.

No. 24275. March 9, 1949.
Rehearing Denied May 25, 1949.

*Marvin B. Simpson, Jr.,* and *Fred S. Dudley,* Fort Worth, for appellant.

*Sam Cleveland,* District Attorney, Stephenville, and *Ernest S. Goens,* State's Attorney, Austin, for the state.

GRAVES, Judge.

The offense is theft of cattle. The punishment assessed is confinement in the state penitentiary for a period of two years.

The record reflects that on the night in question Lit Sparks contacted one, Giles Carter, a trucker, to haul some cattle to Fort Worth. About midnight, Carter came to Finch's Cafe near Gordon where Sparks met him. At the time that Sparks was talking to Carter there were two men sitting in an automobile a short distance away. Sparks remarked, "Here is the man that wants the cattle loaded—let's go load them up." Sparks then got into the truck with Carter directing Carter where to go. After they had driven some three or four miles they entered a pasture, drove to some pens where there was a loading chute. Two men in a car followed them to the pasture where they loaded some fifteen head of cattle which Carter (the trucker), according to instructions, carried to the Jary Commission Company at Fort Worth. Carter did not remember which one of the men gave him instructions as to where to take the cattle. While Carter was on his way to Fort Worth, Sparks and two men in an automobile overtook him near Weatherford where a waybill was filled out showing that the cattle were to be sold by the commission company for and on behalf of one, J. W. Smith. The cattle were sold the next morning by the commission company and a check for the amount of the proceeds of the sale was sent to J. W. Smith at Weatherford, general delivery. The check was apparently endorsed by J. W. Smith and H. C. Coggins, and cashed. There is not any evidence from any source that appellant was present when the cattle were loaded or had any connection with the theft other than his purported confession. About thirty days later, appellant and Barnwell were arrested at Fort Worth by a Texas ranger and the sheriff of Palo Pinto County and were taken to Palo Pinto and placed in jail. While under arrest and confined in jail, a Texas Ranger obtained from appellant a purported confession wherein he connected himself with the theft of the cattle in question. To the introduction of it in evidence, he timely objected on the ground that it was not a voluntary confession. The court, after hearing evidence rela-

tive thereto, overruled the objection and admitted it in evidence to which he excepted and the same is made the basis of his only complaint in his Bill of Exception No. 1. Such bill complains because of the admission of the following confession:

"Palo Pinto, Texas
"August 13, 1947

"I, Leonard Brown, after having been duly warned by Sam Cleveland, District Attorney, first that I do not have to make a statement at all and second if I do make a statement the same may be used in evidence against me on the trial for the offense or offenses concerning which this statement is herein made do make the following free and voluntary statement in writing to the said Sam Cleveland District Attorney the person by whom the above warning was herein given me.

"My name is Leonard Brown, I am 30 years old; I live in Fort Worth, Texas; about noon on July 14, me and Lit Sparks and Barney Bardwell left Forth Worth and came down to a cafe on the highway that was to my memory east of a piece from the highway that turns off of Highway 80 to Gordon; Sparks made a phone call; Lit said something about getting some cattle; about dark me and Barney Barnwell and Lit Sparks went down the Gordon cut off of Highway 80 and turned to the right at the Lone Star Gas Plant and we got some cattle out of one pasture and drove them down the road a piece and into another pasture on the left where there were some pens and a loading chute, and after we had put these cattle in the pen there we left and drove back up to the cafes at the place where the Gordon Road runs into the highway and there me and Barney Barnwell got out and Sparks went on to hunt for a truck to haul the cattle; after a while Sparks came back and there was a man with him who had some beer in a case; he said he had got a truck, in a short time the truck came, and the man with the beer left at the cafe and me and Sparks and Barnwell went back to where the cattle were in the pen and we loaded the cattle into this truck; I do not remember exactly how many but there were any number, several; after we loaded the cattle the truck left and me and Barney and Sparks came back out after the truck to the main highway at the cafe and there we again picked up the man who had some beer and we then drove on up the road until we caught the truck, there we all got out and there we talked to the trucker and there the man with the beer got in with the trucker and went on to Fort Worth and me and Barnwell and Sparks drove on in my car to Fort Worth. We were in a grey Plymouth car, we had told the trucker to take the cattle to the stock yards. The cattle were sold and I got

$200.00 out of the price these cattle brought, this money was given to me by Barney Barnwell. It could have been a little over $200.00 that I got out of these cattle. I have just told this because it is the truth. We did not own any of these cattle at all, we just got them and sold them. I am sorry it ever happened.

"Note: The following written with ink in long hand. I have read this, and it is true.

"Fred W. Foreman
"T. E. Seay

"L. E. Brown"

"Leonard."

The testimony of T. E. Seay, a Texas Ranger, who, in company with the district attorney and the sheriff, seems to be the one who obtained this confession, is as follows:

"We did not get a confession out of this man the minute we brought him down here, never do. We talked to them and tried to show them what was right and what was wrong. As to what I mean by right and wrong, you are an old man and you ought to know what right and wrong means. We tried to get it straightened up and cleaned up. I did not talk rough to him. I said something rough to Barnwell up there at Fort Worth; I told him if he was going to act like a negro he would be treated like one if that was what he wanted. I didn't talk rough to him down here. As to what I said to Brown about making a statement in this case, I don't recall just exactly what I said; I told him that the best thing to do was to tell the truth about it, that people would think more of him to do it. I talked to him at that time possibly an hour or so. It was after night by that time. We just talked to him once that night, as I recall—didn't go back in the morning and get him out. After we got through we put him in jail. We did not take him out of jail the next morning. He gave us a statement that night. I don't recall what time of night it was. I just talked to him one time that night. As to who was there when I talked to him, Mr. Cleveland talked to him and the Sheriff talked to him. As to what Mr. Cleveland said to him, he tried to encourage him to tell the truth and get things straightened up—to do the right thing about it. In reference to how I got that statement, I just kept after him—asked why this thing—a young man apparently of his standing and character—why he would get into a thing like this and advised him to tell the truth about it and get it straightened out. As to what I mean by getting it straightened

out I asked him to tell where the cattle were—go ahead and get these cattle back—that he was into it and to go ahead and take his punishment and do the right thing about it. I don't recall that there was anything said about a suspended sentence— might have been—might have told him—sometimes I tell a fol- low if he hasn't been convicted he is eligible for a suspended sentence which is right and they are, and there is no harm in telling anybody that. He wasn't promised a suspended sentence. As to why I told him that, it is the truth—there is no harm in telling him that—he is entitled to one. I might have told him that—I don't say I did or didn't. I sometimes tell them that, be- cause it is the truth. My method of getting a statement out of a man is not to abuse him. I just talk to them in a nice way and just sweet talk it out of them. If he wants to make a personal matter out of it, it doesn't make any difference what I do then. As to my sweet talking a confession out of Brown, that is the size of it. As to whether he made a confession of his own free will, there never was a confession got that way."

However, the court qualified this bill relative to the last por- tion of Seay's testimony as follows:

"During the cross examination of the witness, T. E. Seay, by Mr. Dudley, counsel for the defendant, and at the time of the examination regarding the preparation and execution of the written statement made by the defendant, Mr. Dudley, refer- ring to that portion of the written statement just above the defendant's signature, to-wit: 'I have head this and it is true,' said to the witness T. E. Seay: 'Q. Who had him do that (refer- ring to that portion of the statement) he didn't do that of his own free will? A. Never was a confession got that way.' "

The only further testimony relative to this statement is found in that of Sam Cleveland, district attorney, who states that at such time nothing was said to appellant relative to a suspended sentence. It is also evident from the record that appellant did not take the stand, and no other testimony relative to this statement was offered by the appellant's attorneys. All mistreatment, promises and threats, if any, are set forth in the statement of Seay above quoted. It is claimed that the state's testimony shows that the taking of this statement violated the provisions of Aricle 726, C. C. P., in that the appellant was com- pelled and persuaded to make such statement. There seems to have been but a short time consumed in the obtaining of this statement from appellant. He was not beaten, threatened nor punished in any way, but merely shown the better way and asked to go right a wrong that it seems he had assisted in per-

petrating. There may have been an element of persuasion shown in the testimony, but a desire to do that which is right is not undue or improper persuasion, nor surely could such cause one to involuntarily do an improper thing. That the request to do the right thing evidently found an early response in the appellant's nature is to his credit. We find no other allusion to any element of unfairness save that of a request to do the right thing. Shall we therefore say that such a request violates Art. 727, C. C. P., in that such request caused him to make a nonvoluntary statement? That such officers had a right to question appellant and ask him for the truth should be granted because of the presence of the statutes regulating same and recognizing one properly made. See Lisenba v. California, 314 U. S. 219, 62 S. St. 280, 86 L. Ed. 166, wherein the doctrine is laid down that as to whether undue influence was used in the procuring of a confession, the determination of the trier of the fact is given great weight as to its voluntary character.

In the late case of Crawford v. State,, 152 Texas Crim. Rep., 352; 214 S. W. (2d) 465, we held as follows:

"Proof merely that the confession was made after questioning by the officers has not been held to render the confession inadmissible," citing Lisenba v. California, supra.

We call attention to the misstatement in the statement of facts relative to the last sentence in Ranger Seay's testimony wherein he was interrogated regarding the sentence written by appellant at the end of his confession when Seay was asked, "Who had him do that?" referring to the written line, "I have read this and this is true." The question, "He didn't do that of his own free will, did he?" and his answer, "Never was a confession got that way", was evidently a conclusion of the witness and surely not one that should alone govern the disposition of this cause.

A theft of certain head of cattle was shown—the corpus delicti—and appellant's statement that he and others took said cattle is sufficient testimony upon which to predicate a verdict. See Kugadt v. State, 38 Tex. Cr. R. 681, 44 S. W. 989, and cases cited.

The judgment will be affirmed.

BEAUCHAMP, Judge: I respectfully dissent.

ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant has filed a motion for rehearing in which he strongly relies on Ward v. State, 144 Tex. Cr. R. 444, 158 S. W. (2d) 516, 62 U. S. Sup. Ct. Rep. 1139. The circumstances under which the confession was obtained in that case and in the present case are so different that we desire to point them out before giving attention to other matters. The undisputed evidence in Ward's case shows that he was taken into custody without any charge having been filed against him and questioned during which he was slapped by one of the officers. He was then released. Some two or three days later, still without any evidence to justify the arrest of Ward, he was again taken into custody by the sheriff of an adjoining county without any warrant of arrest and still no charge having been filed against him, and he was then taken to several different counties and placed in jail, during all of which time the officers were trying to get him to make a confession. He told a county attorney that he would make any kind of a statement the county attorney wanted him to make but that he had nothing to do with the killing. The county attorney very properly declined to take any statement from Ward. He was then placed in jail in Henderson County, many miles from the scene of the murder, and it was there a confession was shortly obtained. Under the undisputed evidence, the acts of the officers in taking Ward into custody was illegal. No such circumstances are present in Brown's case. A complaint had been filed against him charging him with the theft of cattle in Palo Pinto County. He was arrested in Fort Worth, in Tarrant County, the arresting officer having a warrant for such arrest, and was taken to Palo Pinto County where the confession was obtained after only one interview with Brown, after which he was placed in jail.

Brown did not testify and made no claim that his confession was involuntary. That contention is based solely on the evidence of Mr. Seay, the Texas Ranger. This evidence is set out in detail in our opinion of affirmance to which reference is made without repeating same here.

Before adverting further to Seay's evidence, we call attention to some general propositions regarding confessions which it may be well to remember. That a confession is obtained in answer to questions does not alone render it involuntary is too well established both by the holding of the United States Supreme Court and our own court to require citation of authori-

ties. Upon another general proposition, we refer to Thomas v. State, 35 Tex. Cr. R. 178, 32 S. W. 771. The confession in that case was made to an officer who told Thomas "he had got himself into a pretty bad shape, and that it might go lighter with him if he would tell all about it." The confession made after this conversation was admitted in evidence over objection. After some discussion in regard to the question Judge Hurt, writing for the court, said:

"We desire to make some further observations on the subject of confessions. Wharton and Bishop are in conflict on this subject. Wharton admits confessions if the person in authority merely states to the suspected person that it would be better for him to confess, or similar remarks. Bishop rejects confessions made under these circumstances. See Whart. Crim. Ev. (8th Ed.) sec. 651; 1 Bish. New Crim. Law, sec. 1233. What, therefore, is the correct doctrine? The burden is on the prosecuting power to prove that the confession was voluntary. A confession (especially an affirmative one) appearing to have been made with no expectation of its bringing good or averting evil is termed voluntary (Id. sec. 1223) ; the real question being, in every case, whether or not the confessing mind was influenced in a way to create doubt of the truth of the confession. The burden being on the state, the doubt must be excluded. An involuntary confession, uttered to bring temporal good or avert temporal evil, even when the contemplated benefit is small, will be rejected. The circumstances under which the confession was made are of very great importance. They must be looked to in all cases, and when this is done, and there is nothing pointing to the motive prompting the confession, it will be received. Now, whether there is an express or implied promise to aid the suspected person, or a threat of temporal injury, or whether the suspected person is told that it would be better for him to confess, etc., does not always solve the question. It is true that the inducement under which the confession was uttered is of prime importance, but not always decisive. The inducement and the surrounding circumstances decide the question. The inducement may not be sufficient to show the motive for the confession; but, when read in the light of the surrounding circumstances attending it, may be ample proof to create doubt of the truth of the confession. The judge should closely scrutinize these circumstances in connection with the inducement, and decide the question, and if nothing pointing to the motive prompting it appears he should receive it, and over this sort of question the court has a wide discretion. We hold in this case that it does not appear from the record that this discretion was abused. We are not to be understood that no inducement, standing alone,

will justify the rejection of the confession. An inducement may consist in words alone, in acts alone, or in words and acts."

It seems clear from the foregoing quotation that the proper ruling of the court as to the admissibility of a confession is not to be predicated upon some isolated expression found in the predicate for its introduction, but upon the whole picture as it appeared to the trial judge whose discretion must be exercised. For other cases announcing the same principle, see those listed with the Thomas case in Branch's Ann. Tex. P. C., p. 41, second paragraph from the bottom of page.

Isolated expressions by witnesses testifying upon the predicate for admission of a confession in evidence, such as "getting a confession", "sweet talking him out of a confession", are practically meaningless, but the whole predicate must be looked to, which in this instance is found in Mr. Seay's testimony, supplemented by that of Mr. Cleveland, who testified that no promise of a suspended sentence was held out to Brown.

Now, adverting to Mr. Seay's testimony: "I told him (Brown) that the best thing to do was to tell the truth about it, that people would think more of him to do it." No promise here from someone in authority to help him, as in Salvaggio v. State, 126 Tex. Cr. R. 167, 70 S. W. (2d) 593. Brown had no reason to believe "people" could help him regardless of their feelings toward him. "Mr. Cleveland * * * tried to encourage him to tell the truth and get things straightened up,—to do the right thing about it." No promise by Cleveland, the district attorney, to aid Brown in any way. "I just kept after him * * * asked him to tell where the cattle were—go ahead and get these cattle back—that he was into it and to go ahead and take his punishment and do the right thing about it." No promise or hint of aid from the officer that Brown might escape punishment if he confessed; on the contrary, an assurance that punishment would result. "My method of getting a statement out of a man is not to abuse him. I just talk to them in a nice way and just sweet talk it out of them." As to what the officer had in mind by the expression "sweet talk it out of them" can only be arrived at by the overall picture from the entire conversation with Brown preceding the making of the statement. It appears reasonable that Seay meant that no abuse, mistreatment, or promise induced Brown to make the confession.

In the respect mentioned, there is a marked distinction in the present case and the Ward case (supra), and we are unable

to say that the trial judge in the instant case abused his discretion in admitting the confession in evidence.

Upon the general principles discussed, we cite Stewart v. State, 124 Tex. Cr. R. 632, 67 S. W. (2d) 782; Cannada v. State, 29 Tex. App. 537, 16 S. W. 341.

Appellant's motion for rehearing is overruled.

BEAUCHAMP, Judge (dissenting).

I am unable to concur in this opinion. The officer taking the statement relied on as a confession admits it was not freely and voluntarily made: That they just sweet-talked him out of it. I think such is contrary to the dissenting opinion in Ward v. State, 144 Tex. Crim. Rep. 444, 158 S. W (2d) 516, which was in effect upheld by the Supreme Court of the United States in Ward v. Texas, 62 S. C. R. 1139.