# CASES DECIDED

## IN THE

# Supreme Court of Appeals

## OF VIRGINIA

### Wytheville.

AMERICAN RAILWAY EXPRESS CO. v. J. H. STEPHENS.

June 16, 1927.

1. MALICIOUS PROSECUTION—*Probable Cause—Advice of Counsel—Commonwealth's Attorney Responsible for Prosecution.*—In an action for malicious prosecution, where it was undisputed and uncontroverted that whatever part the defendant, through its officials, took in the prosecution, it acted under the advice of counsel after a full and fair disclosure of all the information it possessed as to the affair, and the testimony of the Commonwealth's attorney was that he was responsible for the indictment and prosecution of the plaintiff, it was not necessary for the court to determine as a matter of law from all the evidence whether there was probable cause for the prosecution. These facts are sufficient to relieve defendant from responsibility.

2. MALICIOUS PROSECUTION—*Commonwealth's Attorney Responsible for the Prosecution—Case at Bar.*—In the instant case, an action by an express messenger against the express company for malicious prosecution, the assistant prosecuting attorney drew the indictment and the Commonwealth's attorney "put it before the grand jury." There was no evidence to indicate that any of the express company's officials ever urged or even suggested to the Commonwealth's attorney that he prosecute the plaintiff.

   *Held:* That as a matter of law the prosecution was instituted by the Commonwealth's attorney and that he was responsible for the indictment of the plaintiff and that the defendant was not liable.

3. MALICIOUS PROSECUTION—*Advice of Counsel—Full Disclosure.*—A defendant in an action for malicious prosecution had a perfect defense where all through the affair it acted under the advice of

counsel, the Commonwealth's attorney and his assistant, who were in possession of all the facts known to the defendant.

4. MALICIOUS PROSECUTION—*Probable Cause—Advice of Counsel—Assistant Prosecutor Employed by Defendant—Case at Bar.*—In the instant case, an action for malicious prosecution by an express messenger against the express company, an assistant prosecutor was employed and paid by the express company. The employment of the assistant prosecutor was upon the suggestion and recommendation of the Commonwealth's attorney. But even if this had not been the fact, if the express company, acting upon the advice of the assistant prosecutor, commenced the prosecution of the plaintiff, defendant still would not have been liable to plaintiff.

5. MALICIOUS PROSECUTION—*Probable Cause—No Conflict in the Evidence—Question for Court.*—Where there is no conflict of evidence on the question of probable cause, it becomes one of law to be resolved by the Court.

6. MALICIOUS PROSECUTION—*Probable Cause—Advice of Counsel.*—Where a defendant acts in good faith upon the advice of reputable counsel, after full disclosure of the facts, he is considered to have had probable cause although the advice of counsel may be wrong, and he will not be liable in damages.

7. MALICIOUS PROSECUTION—*Probable Cause—Institution of Prosecution—Case at Bar.*—In the instant case, an action for malicious prosecution by an express messenger against the express company, the prosecution was not instituted by the express company, and if it had been, the attorney for the Commonwealth and his assistant, employed by the express company, were in possession of all the facts, and, not only advised the prosecution, but assumed full responsibility as officials for it.

*Held:* That this was conclusive of the question of probable cause and the trial court erred in not setting aside a verdict for plaintiff and entering judgment for the defendant.

Error to a judgment of the Circuit Court of the city of Richmond in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Reversed and judgment rendered.*

The opinion states the case.

*Wyndham R. Meredith* and *James O. Heflin,* for the plaintiff in error.

*David Meade White, George B. White* and *Andrew J. Ellis*, for the defendant in error.

CHICHESTER, J., delivered the opinion of the court.

This is an action by J. H. Stephens, hereafter called plaintiff, against American Railway Express Company, hereafter called express company, for malicious prosecution.   There was a verdict for $8,000.00 in favor of the plaintiff against the express company, upon which the trial court rendered judgment.

· The prosecution upon which this action is based, resulted from a robbery of $37,663.00 from an express car of the express company, on the Norfolk and Western railroad, between Waverly and Petersburg on the night of December 6, 1923.   At the time of the robbery the plaintiff was in the employ of the express company as express messenger and was in sole charge of the car and all the express therein, including the large sums of money which were stolen.

[1] The plaintiff, Reynolds, Merhout and Longmire, were indicted and tried for the larceny of this large sum of money, upon the theory that he and those charged and indicted with him had conspired to rob the express car.   The plaintiff was acquitted of the charge while the others were convicted.   The evidence against the plaintiff was entirely circumstantial.   It is not necessary to narrate in detail all the circumstances which pointed to the accused as a party to the crime, or to the evidence which tended to exculpate him, for the reason that we do not have to determine as a matter of law, from all the evidence, whether there was probable cause for the prosecution because it is undisputed and uncontroverted that whatever part the express company, through its officials, took in the prosecution, it acted

under the advice of counsel after a full and fair disclosure of all information it possessed as to the affair, and for the further reason that the testimony of the attorney for the Commonwealth himself is that he was responsible for the indictment and prosecution of the plaintiff, and there is no contradiction of this to be found in the record.

Briefly, the facts and circumstances which led to this action on the part of the Commonwealth's attorney were as follows: The robbery took place on a week day when particularly large sums of money were usually sent by the Norfolk banks to the Federal Reserve Bank at Richmond. At Norfolk two bags of money were put by the plaintiff in the key safe and six in the big or combination safe. It was the duty of the money clerk at Norfolk to lock the combination safe, but the plaintiff says he locked it on this occasion and not the money clerk. When the safe was recovered the next day where it had been thrown out of the express car at the time of the robbery, the safe was unlocked and the combination was in perfect order. The testimony of two safe experts was to the effect that this would have been impossible if the safe had been actually locked. The combination to this safe was known only to the money clerks in Norfolk and Richmond. The plaintiff did not know it.

The plaintiff testified at the criminal trial, and in this case, that he had been in the employ of the express company for over ten years. His record had always been good. In answer to the question to tell what happened he said: "The train left at 4:25 and I checked up the money and wrote the money up off my waybills; recorded it on the books. The first stop was Suffolk and on arrival at Suffolk the agent there brought a sealed report and another small parcel of money and I re-

ceipted for them and placed them in the small key safe, and then leaving Suffolk the next stop was Wakefield. I didn't put on anything there and wasn't anything taken off, and the next stop was Waverly. On arrival at Waverly the agent at Waverly brought his book out with a small parcel of money for the Petersburg bank and I signed for that and placed that in the key safe, locked it up and picked up my record book. About that time we pulled out from Waverly and I picked up my record book and remittance waybills, sat down on the key safe as a seat and commenced to make out this waybill and enter it on the record book, when a man came in the car, I guess a minute or two after leaving Waverly, and on entering the car I asked him what I could do for him. He says: 'Have you got a black dress suit case on here checked from Norfolk to Richmond.' I said: 'I will see. My baggage is over there by the door.' I went over to where I had the baggage and looked and I didn't have a black dress suit case checked from Norfolk to Richmond and told him probably it got left and would be on the next train and he said 'all right.' He turned around and started towards the end door leading to the colored coach, the door that he came in, passing my small safe and packer. Thinking he was going out of the car I sat down on my small key safe I was using for a seat and began to resume my work; that is, finish writing up the remittance waybill and enter it on my record book, when he turned around and came back and I thought he came back to ask me something else about the suit case, and just as he came back—he was on the left side of me, and I was sitting on the small key safe—he said: 'Open up that safe,' referring to the combination safe, and as he said that I looked up and saw that he had me covered with a gun—I was looking down the gun barrel—and I told him—when he said that remark he reached over

on the packer—I had my gun, belt and holster lying on the packer right beside me and he was standing right opposite it—he reached over on the packer and grabbed my gun, belt and holster up; it was in the holster. He laid it on a trunk—I had a big drummer's trunk back of me. When he said, 'open up the safe,' I said: 'I can't open it.' He said: 'Yes, you can. Do as I say and I won't hurt you.' I said: 'I can't open it; can't anybody do that but the money clerk in Richmond.' He said: 'Get up and open the key safe.' I saw I was covered with the gun and I had to do his command. I got up and took the key and opened the key safe and when I opened up the key safe he reached in his right overcoat pocket and pulled out a bag, a large sack, and took my gun, belt and holster that he had laid on the trunk and dropped it in the bag and he said: 'Now put that money in this bag.' I caught hold of the—he still had me covered with the gun—I caught hold of the bag with my right hand and reached over in the safe with the left and picked up one of these large sealed bags of currency going to Richmond and dropped it in the bag and under this bag was an old discarded gun, an old gun that was taken from me because it wasn't any good, and he dropped the bag and grabbed that gun and dropped it in the bag he was holding. Then he told me to put that other bag in there. I reached over and got the other bag. I had two large bags of currency in the small key safe and two small parcels of money and a sealed report and a sealed package and a letter and he told me which of those pieces to put in the bag.

"He told me which of them pieces to take from the small key safe and put in the bag and put two sealed bags of currency and two small parcels and a sealed report and left a sealed package and the letter, all he

left in the small key safe.    After he made me put those in the sack at the point of a gun he let the bag lay on the floor right by the small safe, reached in his right overcoat pocket and wrapped a cord around the end of the sack and let the bag lay on the safe and then turned to this combination safe and said: 'You can open up that safe.'    I said:   'No, I swear I can't open it;  I don't know the combination;  only the money clerk in Richmond knows it.'    He said: 'Get up there and close that side door.'    I had a little crack in my left side door and the right side door was closed completely.    So he had the gun pointed at me and I obeyed his command.    I went to the left side door and closed it.    Then he said: 'Hook it.'    I hooked it.    He said: 'Open that right side door.'    That is the door that was closed.    I went over and opened it until he said stop. Then he said: 'Pull that safe over here in the door.'    I caught hold of the safe and dragged it over to the door on the right; it was on the left side just clearing the left side door.    He made me pull it over on the right side and after I did that he said: 'Now turn around,' and I turned around and he said: 'Put your hands behind you,' and I did.    The gun was pointing at me all that time.    Then he tied my hands behind me with a cord or rope.    Then he says: 'Walk up yonder to that end door.'    I walked up there.    Then he took a handkerchief and tied it over my eyes.    Then he said: 'Sit down in that corner there,' made me sit down between two stanchion rods at the end of the car leading into the colored coach.    When he made me sit down there he took hold of my hands and pulled them up close to the stanchion rods and tied them close to the floor and after he did that he said: 'Don't you move,' and he left me and in about a minute or two came back and said: 'What is the number of your combination?'   I said—

I gave him some fictitious combination. The right combination was pasted inside the shield on the safe that goes over the dial by the money clerk in big letters. I was afraid not to give him some combination. I was scared to death and he left and said: 'Don't you move; you stay where you are,' and I never saw him any more. Coming into—between Poe—Poe is a flag stop-tower where the conductor gets orders, three miles east of Petersburg—between Poe and Petersburg. Just before we got to Petersburg I took my head and pulled up from the stanchion rod and got the handkerchief from over my eyes, and I was sitting not far from the end door leading to the colored coach, and took my toe and reached up and unhooked the latch, one of these sliding latches, with the end of my foot and shoved it back and caught hold of the door knob with my foot and opened it and pulled it open. By that time we were coming into the Petersburg yard, pretty near ready to stop at the station. The conductor was standing out on the platform with a lantern and I called him in. He said: 'Joe, what is the matter?' I said: 'I have been robbed, been held up.' He cut the rope and took the handkerchief from over my face and jumped off of the train. Just about that time the train was pretty near ready to stop at the station. When I was released the first thing I did was to look over at the side door and I saw the safe was gone. He had tied me behind a trunk, a great big drummer's trunk, which obstructed the view of the door and the safe, and the first thing I did was to look over and see if the safe was gone, and I saw the safe was gone, and I went up to the left side door that he made me hook and opened it, and just as I unlatched it and opened the door I saw the conductor and Mr. Zirkle and Mr. McBryde come out of the office at Petersburg in the direction of the express car, and I holloed."

"Q. What Zirkle was that?

"A. That is the agent at Petersburg, H. B. Zirkle.

"Q. Is he one of the defendants in this case?

"A. Yes, sir.  While they were coming the baggage porter pulled up and took off two or three trunks and lifted them in the door.  They came out and came in the car and I told Mr. Zirkle what had happened."

The plaintiff had previously made inconsistent statements as to several particulars, notably, as to where he had his gun when confronted by Merhout, but it is unnecessary to go into details as to these here.

Every effort was immediately made by the express company and its officers and agents to discover the perpetrators of the crime.  After several months of search throughout the country, information was secured by the police authorities of the city of Petersburg by which some $28,000.00 was found buried on the Sebeck farm, in Dinwiddie county.  The farm was occupied by the father-in-law of a man named Merhout who had fled from the State with his entire family.  On extradition papers, Merhout was found at Santa Fe, in New Mexico, and brought back to Virginia April 11, 1924.  The discovery of the money led to the arrest of a man named Reynolds on March 22, 1924.  The remaining $9,000.00 has never been recovered.

On his return from Mexico Merhout made a full confession which was reduced to writing and signed by him.  That statement in part was as follows:  "My name is Frank Joe Merhout and I have at times traveled under the name of Joseph Sebeck.  I am thirty-four years old and my home is about twelve miles out of Petersburg, Virginia, in Dinwiddie county.  On December 6, 1923, I entered the express car on Norfolk and Western train between Waverly, Virginia, and Petersburg, Virginia, and held up the express messenger

in his car, taking from him a large shipment of money, consisting of six or eight bags; I do not recall just how many bags at this time.

"I have known J. Fred Reynolds for about one year and know him as 'Red' Reynolds and 'Rat' Reynolds. About eight months prior to December 6, 1923, J. Fred Reynolds came to me and said that a man named Longmire, who worked for the American Railway Express Company, knew how much money was being handled on his train and that Longmire would fix it so that we could rob the train. This was in May or June, 1923. Reynolds took me to the depot in Petersburg, Virginia, and pointed out Longmire to me and I can identify him when I see him. We talked about holding up the train for several months at different times. I did not want to do it and Reynolds said that everything would be all right and that I would not have to kill anybody, and that nobody would harm me, and that I would be safe in going into the car and holding up the messenger and getting the money. When I hesitated, Reynolds said he would do it himself. We met several times and it was agreed that I would do it.

"Reynolds took me to Norfolk, Virginia, about one month before December 6, 1923, the date of the robbery, and we watched the messenger on the train. Then the morning before the robbery was pulled I was coming to Petersburg, Virginia, and Reynolds met me. He gave me the string to tie the messenger with and told me to catch the train about seven o'clock in the morning. Reynolds bought me a ticket and put me on the train. He told me to go to Norfolk and watch the loading of the safes on the train and to catch the train leaving Norfolk at 4:30 P. M., or about that time. Reynolds also told me the best place to get in the car and where to throw out the money.

"I went to Norfolk and went around the depot and watched the wagons and saw them put the safes in the car on the train. I walked around the walks where they loaded the safes. No one went to Norfolk with me. I got there about 10 o'clock in the morning and left at about 4:30 in the evening. I got in the smoking car on the train leaving Norfolk. Reynolds told me to wait until the train got to Disputanta, Virginia. Just after leaving Waverly, Virginia, and between Waverly and Disputanta, Virginia, I went into the express car. The door was not locked and I opened it by turning the knob on the door and walked in.

"The messenger was sitting on a safe, or box, on the side of car. The messenger's gun was on a box in reach of the messenger. I did not pick up the messenger's gun at once. I had my gun in my overcoat pocket. The messenger got up and then I picked up his gun and put it in my overcoat pocket. I then said: 'Boy, how much money you got in here.' The messenger said he could not tell me how much money he had.

"The messenger had two safes. One was a little safe and the other was a big one. The little safe was open when I went into the car. I told him to put the money from the little safe that was open in a sack that I had brought with me from home and which I took from my overcoat pocket. As he took the money out of the little safe I saw another gun in the little safe which I took and put in my overcoat pocket. I then took my gun and held it in my right hand and made the messenger put the money in the sack, which I brought from home. After the money was taken from the little safe and put it in the sack I made the messenger drag the big safe to the door. Both side doors were open. I asked him if he could open the big safe and he said no.

The messenger put about two bags in the sack from little safe. After pulling big safe to the door I made the messenger put his hands behind him and I tied them. After tying messenger's hands behind him I had him go back to end of car to the upright pipes and tied him to one of them and blindfolded him after tying him to the pipes. He was standing up by the pipes where were two of the pipes and I tied him to one of them. The messenger said nothing to me after that and I said nothing to him.

"I then returned to the big safe that was in the doors. I put the sack of money, containing two bags, on top of the safe and threw the safe from the car door on the right hand side going west. I got off the car at switch at Poe where train slows up. I got off on the left side of the car. After I got off I walked back to where I threw the safe and sack off. It took me about twenty-five or thirty minutes to walk back to safe and money. When I got back I found the safe down at bottom of the fill a right good ways from the fence in the grass. The safe was wide open and about six bags of money were scattered over the ground, between the safe and the tracks, several of the bags were bursted open. I had no light. The bags were white and I could see them in the night. I picked up about six or eight bags of money which was all I could find.

"I carried all the bags to the other side of the fence and buried them in the bushes—about twenty feet from where safe landed on right hand side of track and across bridge where timber was cut. After I hid the money under the brush I went to road and walked to Peters-burg, Virginia. I walked around looking for Reynolds, who had agreed to meet me. Reynolds said he was there to meet me but didn't see money thrown off the train. So he went back to town."

The remainder of Merhout's statement deals with the temporary hiding of part of the money on the Sebeck farm where it was later found, division of a small part of it and his flight from place to place and finally to New Mexico in an automobile with his family, where he was later apprehended and brought back to Virginia.

On the night of the robbery, in addition to the evidence that the combination safe had been left unlocked, the plaintiff violated two rules of his employer.   He left the door leading into the express car from the next coach unlocked, when the rules of the express company required him to keep it locked after dark and notice to this effect was written over the door.   He was required by the rules of his employer to keep the pistol, furnished him by it, on his person at all times.   Before Merhout's arrest he insisted that he had the pistol in a holster strapped about his waist and that the robber jerked it off him.   When confronted by Merhout he admitted that it was laying on a trunk back of him.

Merhout's confession, especially with reference to what he had been told about having no trouble with the messenger, together with the plaintiff's conduct when confronted by Merhout, his failure to offer any resistance, and the other circumstances heretofore narrated, led the Commonwealth's attorney to suspect that it was, as he expressed it, an inside job.   Upon cross-examination, in reference to the Merhout confession, the Commonwealth's attorney, F. C. Baugh, was asked this question:

"Q.   Do you think that confession was beneficial or not to Stephens?

"A.   I think that it was not beneficial to Stephens. That is my opinion of it.

"Q.   Will you, pray, give me the grounds for your opinion?

"A.   Well; the confession was the first thing that

came into my hands which caused me to think that it was an inside job. Without reading the confession which came to me first that hadn't occurred to me.

"Q. The confession made you believe it was an inside job?

"A. Yes, sir.

"Q. How on earth did you get the conclusion that it was an inside job from the confession?

"A. I don't think the same about that confession that you do, Mr. White—

"Q. Why?

"A. I wish you would let me finish because I have a hard time answering without being interrupted. I suppose you want my opinion about the confession as long as you have started on it.

"Q. I will repeat the question—

"A. I will finish it.

"Q. Do you understand the question?

[2] "A. I think so. If I had read the part of the confession which you seem to be mostly concerned with; that is, the words: 'I made him put the money in' or 'I held him up with a gun,' if I believed that and disbelieved the part of it in which he makes it known more or less it was a fixed job, then I would feel the same way you do about it, but I wouldn't close my eyes to one-half and open them to the other half." Later he adds: "The part of that confession or that written instrument with which I had to deal when I was deciding who I would prosecute and which I would try them for, the part of it which puts in my mind that it was a fixed job, along with the other statements made by Merhout to me, makes me say that you couldn't possibly convict any man of highway robbery on that confession unless you could tell a jury to believe one part and disbelieve the other part and hide all the other facts." And in ex-

planation of this he said: "Because I didn't think it was highway robbery and I don't believe it was highway robbery and, on the contrary, I was convinced it was a conspiracy and convicted them of grand larceny. I wouldn't ask any jury to convict him of highway robbery, and I wouldn't indict him for a thing I knew was hopeless." He follows this up with the statement that he and Mr. Heflin, assistant prosecuting attorney, drew the indictments against all the parties and that he, Baugh, "put it before the grand jury." There isn't a line of testimony in the whole voluminous record that indicates that any of the express company officials ever urged or even suggested to the Commonwealth's attorney that he prosecute the plaintiff. We think, therefore, that as a matter of law the prosecution was instituted by the Commonwealth's attorney and that he was responsible for the indictment of the plaintiff.

[3] But even if this were not so the express company has a perfect defense because of the fact that all through this unfortunate affair it acted under the advice of counsel, the Commonwealth's attorney and his assistant, who were in possession of all the facts known to the express company.

In response to the direct inquiry: "Q. Mr. Baugh, state whether or not all of the facts which developed on the trial of these cases which were in the possession of the officers and agents of the American Railway Express Company were narrated to you by those persons before the indictment against J. H. Stephens was brought?"

"A. I don't know what facts they had in their possession. I know that practically all that I now know about the case and practically all I knew about it when the case was prosecuted in Prince George county came to my knowledge before Mr. Stephens was indicted."

[4, 5] The whole record bears out this statement.

Indeed, there was no contention in the oral argument before this court, and there is none in the briefs, that there was not a full disclosure of every fact and circumstance connected with the transaction.   It was with a knowledge of the facts and circumstances that the Commonwealth's attorney concluded, as he testified, that it was an "inside job," and *he* "put the indictment before the grand jury."  The fact that he had an assistant who was employed and paid by the express company makes no difference, even if his employment had not been suggested by the Commonwealth's attorney, and if the Commonwealth's attorney had not recommended Mr. Heflin, as was the case, even if it had acted upon advice of the assistant prosecutor and had commenced the prosecution under his advice the result would have been the same.   There being no conflict of evidence on this phase of the case, the question of probable cause becomes one of law to be resolved by the court.

[6]  Whatever the rule elsewhere, it has long been the established rule in Virginia, that where a defendant acts in good faith upon the advice of reputable counsel, after full disclosure of the facts, he is considered to have had probable cause although the advice of counsel may be wrong, and he will not be liable in damages.  *Virginia-Tennessee Motor Truck Corp.* v. *Wilson*, 140 Va. 260, 124 S. E. 231; *Saunders* v. *Baldwin*, 112 Va. 431, 71 S. E. 620, 34 L. R. A. (N. S.) 958, Ann. Cas. 1913B, 1049; *Gresham* v. *American Ry. Exp. Co.*, 147 Va. 395, 137 S. E. 471.

While the decisions are not uniform, the weight of authority is in accord with the Virginia rule.  In *Hicks* v. *Brantley*, 102 Ga. 264, 29 S. E. 459, quoting from *Lenoir* v. *Marlin*, 10 Tex. Civ. App. 378, 30 S. W. 566, this is said: " 'Where a person in good faith makes to the

prosecuting attorney a fair statement of the facts, as known to him, concerning the charge of which he makes complaint, the action of the attorney in advising the prosecution is conclusive proof of probable cause, in an action for malicious prosecution against the person making the complaint.' "

"We know of no case where it has been held that the advice given by attorneys for the Commonwealth in cases which came under their supervision was not probable cause for the prosecution, where such advice was to the effect that the circumstances truly stated constituted a violation of law. On the contrary, in such of the States where the question has been decided and which has come to our knowledge, the courts have uniformly held the advice of prosecuting officers to be probable cause to authorize prosecution." *Supra,* 102 Ga., at page 273, 29 S. E. 462.

"These facts" (submitted with substantial accuracy to the prosecutor of the pleas of the county) "were not, as seems to us, in any material degree in dispute and it was therefore the function of the court to pass upon their effect in law. The question of the existence of reasonable and probable cause for the prosecution and of the presence of malice should have been decided by the court and should not have been left as it was to the jury." *Magowan v. Rickey,* 64 N. J. Law 404, 45 A. 805.

Under the facts of the instant case these authorities are conclusive. We do not have to consider the question of probable cause as if it had been presented upon a conflict of the evidence, nor do we have to consider the question as to whether advice of counsel was sought with an honest purpose of being informed as to the law or whether the attorneys engaged in the prosecution of all four of the parties against whom indictments were

found, were given all the material facts in possession of the officers of the express company (although this fully appears) because the Commonwealth's attorney personally conducted the investigation of the case from the very beginning and he states that he prosecuted all the parties indicted because of the knowledge thus acquired. He conferred with Captain Jefferson of the police department of the city of Petersburg as well as the agents of the express company; he questioned Merhout carefully and checked up his statements so as to test their truthfulness after he had decided to make a clean breast of the whole matter, and had arrived at the decision, after weighing all the proof, that it was not a case of highway robbery but of grand larceny. The defendants were not even consulted as to this conclusion but it was simply announced to them by the attorney for the Commonwealth. As was their duty they submitted to his decision, though up to that time they had supposed that it was a case of highway robbery. When Mr. Owens, an officer of the express company, stated that he wished to avoid the likelihood of damage suits, he was told by the Commonwealth's attorney that the decision to prosecute for conspiracy to commit larceny and not for highway robbery was for him, the Commonwealth's attorney, to decide; that that was the business of the Commonwealth and that Mr. Owens had nothing to do with it. The conclusion of the Commonwealth's attorney was the result of his own investigation and of numerous interviews with the officers of the express company and the special agents of the police department of the city of Petersburg.

[7] Under these circumstances it is not necessary to consider the various assignments of error in detail. The prosecution was not instituted by the express company, and if it had been, the attorney for the Commonwealth

and Mr. Heflin, his assistant, employed by the express company, were in possession of all the facts and not only advised the prosecution but assumed full responsibility, as officials, for it. This is conclusive of the question of probable cause and the trial court erred in not setting the verdict aside and entering judgment for the defendant.

For the reasons assigned the judgment of the circuit court will be reversed and judgment rendered here for the defendant.

*Reversed and judgment rendered.*