## Richmond.

### McDaniel v. The Commonwealth.

#### March 15th, 1883.

1. CRIMINAL PRACTICE—*New trials—Rule.*—Much. caution is used by this court in granting a new trial where it is asked solely on the ground that the verdict is contrary to evidence, great weight being given to the verdict of the jury. See *Pryor's case,* 27 Gratt. 1010.

2. IDEM—*Murder—First degree—Second degree.*—To constitute this offence the killing must be predetermined, and not under momentary impulse of passion; though the determination need not have existed any particular length of time. *Prima facie,* all homicide is murder in the second degree. *Onus* on prosecution to raise the offence to the first degree.

3. IDEM—*Case at bar.*—A quarrel occurred between prisoner and deceased. Former gave the latter the lie. They separated. Twenty minutes later deceased, with light walking-stick, approached prisoner, saying he would not stand what prisoner had said. Prisoner picked up a "bearing stick." Deceased asked, "why he stood holding that stick?" Prisoner answered: "If you come here I will show you." Deceased raised his cane to parry a blow from prisoner, and may be, struck at, or struck prisoner, who then struck deceased two blows with the "bearing-stick," from which he died in about two hours.

HELD—*(by the court)*:

> The presumption is not warranted from the mere use of that weapon, without any words or circumstances, other than those mentioned, tending to show the prisoner's intent, that such intent was not to repel an attack or to inflict bodily harm, but to kill. The facts do not prove murder in the first degree.

Error to judgment of circuit court of Amherst, rendered 12th July, 1882, refusing a new trial to Frederick McDaniel, who was during same term convicted of murder in the first degree, of J. C. Carter, and sentenced to be hanged. Opinion fully states the facts.

*Wm. B. Tinsley,* and *L. S. Marye,* for the plaintiff in error.

1. The circumstances of this case are almost identical with those of *Poindexter's case*, 33 Gratt. 766. There accused stood with deadly weapon in hand, and said to deceased: "If you strike me with that [walking] stick, I will shoot you." There deceased met his death from five pistol shots in his body. Here from two blows from a stick barely more than an inch in diameter. Yet, there accused suffered only the lighter punishment of manslaughter, whilst here the accused is under death sentence.

2. The facts here show merely a fight between two drinking men with sticks, provoked by the deceased, and not anticipated by the accused—far less aggravated than *King's case*, 2 Va. Cases 78.

3. The *Peter Wright case*, 33 Gratt. 880, and the *Nelson Mitchel case*, Id. 872, have been referred to as similar to this case. They cannot be likened, because the first, like *Dock Wright's case* (1 Matthews 914), possessed, as the court said, "not a single circumstance of provocation, excuse, or extenuation for his crime." In the second, the previous threats of prisoner, the deadly weapon used and the difficulty brought on by him, was thought to warrant the conviction that he brought it on for the purpose of creating a pretext to kill deceased. Here there was provocation, excuse and extenuation; no previous threats, no difficulty brought on by the prisoner, no deadly weapon used, and no exhibition of that *wicked, depraved and malignant spirit* essential to murder in any degree.

*The Attorney-General F. S. Blair*, for the commonwealth.

HINTON, J., delivered the opinion of the court.

This is a writ of error to a judgment of the circuit court of the county of Amherst, convicting Frederick McDaniel, the plaintiff in error, of murder in the first degree, and sentencing him to be hanged therefor. The accused moved the court to set aside the verdict and grant him a new trial, but the court over-

ruled the motion, and to this ruling the prisoner excepted. The bill of exceptions contains a certificate of what is stated to be the "facts and all the facts proved upon the trial."

The only assignment of error is the refusal of the court to set aside the verdict and to award a new trial.

Upon an application of this kind, this court is always loth to disturb the judgment of the trial court. On this point, Christian, J., delivering the opinion of the court in *Pryor's case,* 27 Grat. 1010, said, "this court has always acted with great caution in granting new trials in cases where the new trial is asked solely upon the ground that the verdict is contrary to the evidence, and great weight is always given, and justly so, to the verdict of the jury and judgment of the court in which the case is tried. The cases are very rare in which this court interferes; and it is only in a case where the evidence is plainly insufficient to warrant the finding of the jury." I fully recognize the salutary influence of this rule, and have no purpose to relax its operation. But I think we may remand this case for a new trial without being amenable to the charge of violating its spirit or provisions in the special circumstances of this case. I proceed to state as briefly as I can some general doctrines of the law of homicide, which will, I think, materially assist us in arriving at a correct conclusion upon this point. Every homicide under our statute is *prima facie,* a case of murder in the second degree. And it is incumbent upon the commonwealth in a case like the present, where the offence was not committed by any of the specific means enumerated in the statute, that is "by poison, lying in wait, imprisonment or starving, nor in the commission of or attempt to commit arson, rape, robbery or burglary," in order to elevate it to murder in the first degree, to prove by evidence, either direct or circumstantial, beyond rational doubt, that the killing was "wilful, deliberate and premeditated." And on the other hand, the burden is upon the accused, if he would reduce the offence below murder in the second degree, to show the

absence of malice and the other mitigating circumstances necessary for that purpose.

Now to constitute a "wilful, deliberate and premeditated killing," it is necessary that the killing should have been done on purpose, and not by accident, or without design; that the accused must have reflected with a view to determine whether he would kill or not, and that he must have *determined to kill*, as the result of that reflection, before he does the act—that is to say, the killing must be a pre-determined killing upon consideration, and not a sudden killing upon the momentary excitement and impulse of passion, upon provocation given at the time, or so recently before, as not to allow time for reflection; and this design to kill need not have existed for any particular length of time, it may be formed at the moment of the commission of the act. *King's case* and note, 2 Va. Cas. 84; *Whiteford's case*, 6 Rand. 721; *Jones's* case, 1 Leigh, 598; *Hill's case*, 2 Gratt. 595; *Howell's case*, 26 Gratt. 995; *Wright's case*, 33 Gratt. 881; *Wright's case*, 75 Va. R. 914. With these familiar principles of the law of homicide in mind we now come to examine the facts of this case.

From the certificate thereof, it appears that the prisoner who lived in a cabin in the yard, and upon the land of the deceased, near Pedlar Mills, in the county of Amherst, went on the 24th day of January, 1882, to a mill a few miles distant, and that one of the horses which he drove to the wagon on that occasion was loaned to him by the deceased—that he returned with the wagon about two hours after sundown, and that at that time the deceased was absent from home—that the wagon was then sent for a load of wood, a small son of the prisoner driving it. It returned with the wood a little while after dark, and the prisoner commenced unhitching the team, when the deceased went out to the wagon, and may have assisted in unhitching. A quarrel ensued between the prisoner and the deceased, both of whom were in liquor, although not drunk. The deceased had taken a drink at a negro man's cabin just before night. The

deceased charged that the prisoner had neglected his horse in not feeding him during the day. Loud and violent language was used, in the course of which the prisoner gave the lie to the deceased as to the charge of not feeding his horse. The deceased applied harsh and profane language to the prisoner. The prisoner having unhitched the horses, carried them to the creek to water them. After the prisoner got back with the horses from the creek, which was some distance off, he led the horses around the road, just outside of the fence, on the way to the stable, and when he came to the wood-pile, by the side of the yard-fence, the deceased, whose wife had vainly tried to detain him in the house, came towards the fence and towards the prisoner with a walking-stick of dogwood, light, and not long, in his hand—that whilst his wife was trying to detain him in the house, the deceased said *he would not stand what the prisoner had said.* She followed him to the fence. There was a stick used in plowing, commonly called a *bearing-stick,* about four feet and a half long, and about three and a half inches in circumference, of seasoned white oak, lying on the wood-pile. And this stick the prisoner picked up. That the deceased demanded to know why the prisoner stood holding the stick in his hand; to which the prisoner said: "If you come here I will show you." The fence around the yard *at this point* was a low one, not more than about two and a half feet high, so that a man could step over it, and this point was about twelve or fifteen yards from the house of the deceased. This was about fifteen or twenty minutes after the first quarrel at the wagon. The deceased raised his stick to ward off a blow from the prisoner, and may be, he struck at or struck the prisoner. The prisoner then stepped over the fence, struck at the deceased and knocked the walking-stick out of his hand; and with the bearing-stick struck the deceased two blows over the head. From the first blow, which was above the left eye, the deceased was apparently made insensible, but did not fall. The second blow fractured and indented the skull behind and above the left ear. He never

spoke afterwards, and died within about two hours from the effects of the blows.

These being all the facts proved on the trial, as the judge certifies, do they make out a case of "wilful, deliberate and premeditated killing"?

The prisoner certainly killed the deceased, and it is equally certain that this was not accidentally done by him. But this is not enough to constitute a case of murder in the first degree. Before we can pronounce him guilty of murder in the first degree we must be able to find, in the certificate of facts, proof, direct or inferential, sufficient to justify the jury in coming to the conclusion that the death of the deceased was the ultimate result which the concurring will, deliberation and premeditation of the prisoner sought. *Jones's case,* 1 Leigh, 611. If we fail to find this measure of proof, the case falls short of murder in the first degree. For it is laid down and believed to be undoubted law, that in all cases of slight and insufficient provocation, if it may be reasonably inferred from the weapon made use of, or the manner of using it, or from any other circumstance, that the party intended merely to do some great bodily harm, such homicide will be murder in the second degree, in like manner as if no provocation had been given, but not a case of murder in the first degree. Davis's Cr. L. 99.

In this case there had been a quarrel between the prisoner and the deceased, whilst he and, perhaps, the deceased were unhitching the horses, but there was no disposition shown by the prisoner to strike the deceased either with his fists or with a weapon at that time. On the contrary, he unhitches the horses, leads them to water, and is in the act of quietly leading them to the stable, when just as he arrives at the wood-pile, where, doubtless, the wagon-load of wood had just been deposited, he perceives the deceased, in spite of the entreaties of his wife, armed with a walking stick, coming towards him and bent upon having a difficulty with him. In this condition of affairs, instead of selecting from the load of wood, a stick of wood, one

blow with which would have been certain death, he stops and picks up a stick of comparatively insignificant proportions, which he finds lying on the wood-pile. It is true that when the deceased asked him why he stood there holding that stick in his hand, he replied, "if you come here I will show you." But this language, in the light of what subsequently happened, can only be interpreted to mean something like this, namely, whilst I shall not seek you, yet if you shall attack me with that cane, I shall repel your attack with this stick. This language, instead of revealing a deliberate and preconceived purpose to kill, would imply, it seems to me it might well be argued, that in the event the deceased kept away from him, it was not his purpose to bring about a difficulty. At any rate I do not think that, from this language, even if coupled with the blows inflicted on the deceased, without any other acts or declarations shedding light upon the intention of the prisoner, that the jury were warranted in finding, or that this court would be justified in holding that the prisoner killed the deceased in pursuance of a deliberate and preconceived purpose to kill him, and that, therefore, this was a case of murder in the first degree.

It is not intended to intimate in anything that has been said in this opinion that the stick used by the prisoner in his encounter with the deceased was not a deadly weapon, for the fatal effect of its use in this case but too surely establishes its deadly character when used by a person of the prisoner's strength, nor is it intended in any wise to contravene that wise and wholesome rule, "that a man must be taken to intend that which he does, or which is the natural and necessary consequence of his act." *Murphy's case,* 23 Grat. 972 ; *Hill's case,* 2 Grat. 595. All that I do mean to say is, that giving to this rule its proper scope, in the meagre and peculiar circumstances of this particular case, this court is not warranted in presuming from the mere use of this weapon, without any words other than those heretofore mentioned, or circumstance, either before or after, or at the time of the killing, going to show the intention of the prisoner that

the purpose of the prisoner was not either to forcibly repel the attack of the deceased nor to inflict grievous bodily harm upon him, but to kill him.

For these reasons I am of opinion that the judgment of the circuit court of Amherst county be reversed and annulled, the verdict of the jury set aside, and that a new trial be awarded the plaintiff in error.

*Richardson* and *Fauntleroy, J.'s,* concurred in the opinion of *Hinton, J.*

*Lewis, P.,* and *Lacy, J.,* dissented.

The order was as follows:

This day came again as well the plaintiff in error by his counsel, as the attorney-general on behalf of the commonwealth, and the court having maturely considered the transcript of the record of the judgment aforesaid and the arguments of counsel, is of opinion, for reasons stated in writing and filed with the record, that the judgment of the said circuit court is erroneous in refusing to set aside the verdict of the jury and to grant a new trial to the plaintiff in error.

It is therefore considered by the court that the said judgment be reversed and annulled, the verdict of the jury set aside, and a new trial awarded the plaintiff in error.

Which is ordered to be certified to the said circuit court of the county of Amherst.

REVERSED.