## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

### Virgil G. Noell, Jr. v. Gene T. Angle, et al.

January 14, 1977.

Record No. 751502.

Present, Carrico, Harrison, Cochran, Harman, Poff and Compton, JJ.

*Edward L. Hogshire; F. Guthrie Gordon, III (Lowe and Gordon, Ltd., on brief), for plaintiff in error.*

*Michaux Raine, III (Davis, Davis, Raine & Davis, on brief), for defendants in error.*

COMPTON, J., delivered the opinion of the court.

In this malicious prosecution case, we consider the subject of probable cause and whether the defense of advice of counsel was established as a matter of law.

The plaintiff below, appellant Virgil G. Noell, Jr., sued appellees Gene T. Angle, T. D. Board, and Russell M. Dyer for

compensatory and punitive damages, which plaintiff claimed resulted from his wrongful arrest on a charge of feloniously attempting to break and enter Angle's residence in Franklin County on March 15, 1974. The defendants, sued in their individual capacities, were deputy sheriffs of the county.

At the conclusion of all the evidence during the jury trial, the court below sustained defendants' motion to strike plaintiff's evidence and summary judgment was entered for defendants on August 21, 1975. We awarded plaintiff a writ of error limited to consideration of one assignment of error, which attacked the trial court's action in sustaining the motion to strike.

The facts are not in material dispute, the bulk of the probable cause evidence being presented through the testimony of the defendants, called as adverse witnesses by the plaintiff.

Near midnight on March 14, 1974, defendant Angle's wife, while in their home alone with the couple's three small children, heard a noise which "sounded like the [locked] garage door being lifted." The garage was attached to the dwelling. Shortly thereafter, she observed the "figure of a man" standing about 40 feet from the home near a picnic table in the back yard, but was unable to identify the individual due to the poor lighting conditions. Through a rear window she continued to observe the man, who was facing the house, for what "seemed like an eternity" but which was actually only a few minutes. The prowler then "just turned and walked down into the woods", which adjoined the Angles' back yard, and disappeared from her sight.

Mrs. Angle immediately telephoned her husband, who was on duty at the Franklin County Sheriff's office, and reported the incident to him. Angle rushed to his home and, after his wife again "related the same facts", radioed the dispatcher at the sheriff's office and asked that the Bedford County Sheriff be requested to send the "Bedford County tracking dog" to Angle's home. Defendants Board and Dyer, who were on duty patrolling in a police vehicle, heard Angle's radio call for the dog and proceeded to Angle's home. Mrs. Angle then advised Board and Dyer of what she had earlier heard and seen. The three deputies examined the garage door and found it still locked but raised three to five inches, which was "as far as it could be raised with the latch on" because of "play in the door". Fingerprint "smudges", never identified, were "lifted" from the door handles.

About 40 minutes after Board and Dyer reached Angle's home, Bedford Deputy Sheriff William Mayhew arrived with "Dixie", a seven-year-old State-owned purebred registered bloodhound, which Mayhew customarily "handled" on tracking assignments. Mrs. Angle and the defendants informed Mayhew of the facts and Mayhew then led Dixie to the picnic table area. The dog "seemed to pick up a trail", went to the garage door, and proceeded to the wooded area where Mrs. Angle had last seen the prowler. The leashed dog continued, "running the track good", through bushes across a "branch", through a field, south along the gravel shoulder of a paved highway for "a quarter of a mile", into the highway median strip south for about 500 feet, back to the highway shoulder south for "maybe half a mile", back into the median strip, across to the other side of the highway, still tracking south, to the shoulder of an intersecting highway, up a hill, past a yard in front of one house, and into the corner of the yard of plaintiff's residence to its front door, a distance of about 1.5 miles from Angle's home. Mayhew then pulled Dixie away from the door several times and took it to different locations in and outside of plaintiff's yard. Each time the dog returned directly to plaintiff's front door, sniffing its bottom edge.

During the tracking, Mayhew handled Dixie's leash with defendant Dyer following on foot. Defendant Board, in radio contact with Dyer, pursued by automobile accompanied by another Bedford deputy. Defendant Angle remained at his home monitoring the Board-Dyer radio conversations, which revealed the exact course of the trail. When Dyer described the location where the tracking terminated, Angle recognized it to be the residence of Noell, whom Angle knew.

Angle then went to Noell's home and found the other officers waiting in the front yard. Upon being advised by Mayhew of Dixie's actions on Noell's premises, Angle decided to knock on the front door to "see what we could find out." The time was about 2:00 a.m. on March 15.

Plaintiff and his wife were awakened by the knocking. Noell opened the door and asked the five officers, who were in uniform, the purpose of their visit. Angle indicated there had been "trouble" at Angle's home and implied Noell knew the nature of the "trouble", which Noell denied. When the details of the incident were then related to Noell, he stated that he had been at home since about 8:00 p.m. that same evening, the time

when he returned from obtaining medicine for his wife and small child, who were both ill, and that he had retired about 10:00 p.m. Noell then stated to the group that Angle had been "harassing him and his wife for some time [and] he was getting tired of it"; that he "wanted everyone's name that was standing in the yard"; and that he would sue all of the officers "in the morning" unless they left his premises at once.

The evidence revealed that in 1973, about 13 months prior to this incident, Angle and Noell had an "encounter" in which Angle accused Noell of "following" Mrs. Angle and "trying to go with her", which accusation Noell denied. Noell testified that he had no further "confrontation" or direct "involvement" with defendant Angle after their initial "encounter" and before the present dispute.

Noell testified that when he unlocked his front door and opened it, Angle "was red in the face, ready to come in after me" Plaintiff's wife stated Angle was "in a rage" and "loud" and that Angle sought to go into detail with her about the 1973 incident.

Noell further testified that, following the brief discussion on his front porch, Angle stated to Noell that the officers would discuss the evening's incident with the Commonwealth's Attorney and that "whatever he advises, we are going to take his advice and take action." Noell also testified that, to his knowledge, no person visited his home or yard that evening prior to arrival of the officers and that he had not "used" the front door of his residence for at least two to six months.

The officers next went to the Franklin County Sheriff's Office and Robert C. McLaughlin, then Assistant Commonwealth's Attorney of Franklin County, was called to the county jail. Upon his arrival there about 3:00 a.m., McLaughlin saw Dixie in Mayhew's custody. McLaughlin testified he had a special interest "in bloodhounds and tracking dogs"; that prior to the day in question he had observed Dixie "in action" tracking. McLaughlin discussed the evening's incident with Mayhew, Board and Angle. At that time, Angle informed McLaughlin of his 1973 "encounter" with Noell. McLaughlin testified that upon "getting [the information] all together", he advised the officers "they had probable cause, to go to the magistrate and seek a warrant."

Thereafter, Board appeared before a magistrate and the warrant was issued. Noell was then arrested at his home by

Board and Dyer about 4:00 a.m., taken to jail, fingerprinted, photographed, placed in a cell, bonded, and released from custody about 8:00 a.m. the same day. He retained counsel and within several weeks after the arrest, but before the preliminary hearing, the charge was "nol prossed" on motion of McLaughlin because of "insufficient evidence to obtain a conviction." The present action was filed about 11 months later.

In sustaining defendants' motion to strike, the court below ruled the defendants acted on advice of counsel after "a full and complete and honest disclosure" of the relevant facts, and that probable cause for initiating the criminal proceedings existed as a matter of law.

We have recently examined, in *Bain* v. *Phillips*, 217 Va. 387, 228 S.E.2d 576 (1976), the malicious prosecution cause of action. There, we were not required to decide whether the defense of advice of counsel had been established as a matter of law because the jury had already properly determined that the lay prosecutor had proceeded independently without the advice of counsel. But here we confront the narrow question whether the trial court erred in deciding the advice of counsel issue, and in turn the probable cause question, as a matter of law.

Among the elements of the cause of action, upon which the plaintiff has the burden of proof, are that the criminal prosecution was initiated by the defendant without probable cause and with malice. 217 Va. at 393, 228 S.E.2d at 581. And malice may be "inferred from the want of probable cause, but the latter can never be inferred from even the plainest malice." *Scott* v. *Shelor*, 69 Va. (28 Gratt.) 891, 909 (1877). And, too, if the defendant sustains his advice of counsel defense, it is considered he had probable cause for initiating the criminal proceeding, although the advice he received may have been wrong. *Bain, supra,* 217 Va. at 394, 228 S.E.2d at 581.

Advice of counsel may be a shield against a suit for malicious prosecution if the defendant proves (1) that he sought counsel with an honest purpose of being informed as to the law, (2) that he made a full, correct and honest disclosure to counsel of all material facts in his knowledge bearing on the plaintiff's guilt, or which should have been within his knowledge had he made a reasonably careful investigation bearing on such guilt and (3) that he was in good faith guided by the advice of counsel in causing the arrest of the plaintiff. *Evans* v. *Atlantic Coast*

*Line Ry.*, 105 Va. 72, 76-77, 80, 53 S.E. 3, 3-4, 5 (1906). *See Bain, supra*, 217 Va. at 394, 228 S.E.2d at 581. Whether such advice is thus sought and obtained is usually a question for the jury, *Spitzer* v. *Clatterbuck*, 202 Va. 1001, 1004, 121 S.E.2d 466, 468 (1961); *Commander* v. *Provident Relief Ass'n*, 126 Va. 455, 464, 102 S.E. 89, 92 (1920), but when reasonable minds cannot differ that the defense has been established, it becomes the function of the court to decide the question as a matter of law. *American Ry. Express Co.* v. *Stephens*, 148 Va. 1, 17, 138 S.E. 496, 501 (1927).

Plaintiff argues the trial court invaded the province of the jury by striking the evidence. He contends a jury could find defendants failed to prove "they sought advice with an *honest* purpose." He asserts that given "the obvious rage of Defendant Angle and the fact of his apparent belief that Noell had been pursuing his wife, presumably with romantic notions, a·year earlier, Angle's motives were questionable at the best." He argues the jury could have found Angle wanted Noell arrested to terminate any further "episodes" between Noell and Angle's wife, and "not to bring a criminal to justice."

Plaintiff also contends a question of fact was raised "whether there had been full disclosure of all material facts the Defendant *knew* or *should have known* if they had made a reasonably careful investigation." He argues there was "virtually no investigation beyond interviewing [defendant's] wife and following the dog." He labels "feeble" the unsuccessful attempt to identify the fingerprints. He says there was "ample opportunity to make impressions of footprints, to check for items missing from the garage, [and] to check out Noell's claims of going [for medicine] and being home all evening after 8:00 p.m." He suggests defendants should have inquired about Noell's "general reputation, character and the likelihood that he could flee before a more thorough investigation could be completed."

The main thrust of Noell's argument is directed to defendant Angle. But he also urges defendants Board and Dyer are jointly liable with Angle because they, too, acted "with malice, ill will and with a reckless and wanton disregard for Plaintiff's rights". We reject the plaintiff's contentions and affirm.

■ Contrary to plaintiff's initial argument, we believe the evidence conclusively establishes that Angle and the other defendants sought McLaughlin's advice with a *bona fide* desire

to be informed as to the law and in an effort to obtain guidance regarding further handling of the case. The plaintiff speculates that Angle had an ulterior motive in seeking McLaughlin's counsel. None of the credible evidence supports such a notion. In the first place, 13 months had passed since the 1973 episode, the first and only confrontation between the plaintiff and Angle. Moreover, on the day in question, the officers stated to Noell they would be guided by the Commonwealth's Attorney's instructions. Furthermore, and more importantly, Angle, in reporting a crime at his own home, disclosed to McLaughlin the facts of the 1973 confrontation. If Angle intended to harass Noell for selfish reasons, as alleged, it is reasonable to conclude that Angle would have concealed the 1973 incident from McLaughlin, to lessen the probability that McLaughlin, feeling the officers had overstated the case due to Angle's personal involvement, would decide against prosecution.

Nor are we persuaded by plaintiff's second contention. We find the evidence positively establishes the defendants made a full, correct, and honest disclosure to McLaughlin of all material facts, bearing on Noell's apparent guilt, which were in their knowledge, or which should have been in their knowledge under the circumstances. Plaintiff dwells on the argument that defendants should have made a further, extended investigation before seeking McLaughlin's advice. But a *reasonably careful* investigation is all the law requires, not an investigation sufficient to convict. Here, the officers were armed with explicit information from Mrs. Angle, an identified reliable source, of what she had heard and seen. Her account was confirmed, in part, by the officers' observations of the locked but raised garage door. Then, an experienced and well-trained tracking dog, which according to the evidence had been highly successful in finding criminals and lost persons, corroborated some of Mrs. Angle's observations by starting to track precisely where she said the prowler disappeared from her sight. Thereafter, the dog tracked without hesitation 1.5 miles directly to Noell's front door. At the front door, the officers learned that Noell denied the charge and that he claimed to have been home for about six hours. They observed him immediately become belligerent, threatening to sue each uniformed officer. Fingerprint identification was not feasible. The evidence showed that while the Franklin County police author-

ities had the facilities to obtain fingerprints, they were not equipped to promptly identify them; the same was true as to footprint identification. Finally, and significantly, McLaughlin, who possessed all of the foregoing information and who had independent knowledge of the dog's qualifications and reliability, did not recommend additional investigation, obviously concluding he had sufficient facts on which to make an objective probable cause decision.

For these reasons, the judgment of the trial court will be

*Affirmed.*