### Richmond

## STEPHEN MATTESON EPPERLY

## V.

## COMMONWEALTH OF VIRGINIA

September 9, 1982.

Record No. 810626.

Present: All the Justices.

*Max Jenkins; R. Keith Neely* for appellant.
*James E. Kulp, Senior Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

The defendant, Stephen Epperly, was tried by a jury, convicted of the first degree murder of Gina Hall, and sentenced to life imprisonment. The victim's body was never found. The evidence was entirely circumstantial, both as to proof of the *corpus delicti* and as to the element of premeditation. The defendant's appeal raises questions concerning the sufficiency of the evidence to prove these elements, the admission of evidence concerning the victim's good character, the admission of evidence of experiments conducted with a tracking dog, and certain additional assignments of error. We affirm the conviction.

The facts are undisputed. After the court denied his motion to strike the Commonwealth's evidence, the defendant presented no evidence and rested. We review the evidence in the light most favorable to the Commonwealth.

## THE FACTS

Gina Hall disappeared the night of June 28, 1980. She was last seen leaving the Marriott Hotel in Blacksburg with the defendant. She was last heard from that same night when she called her sister and said she was at a lake house with the defendant.

In June 1980, Gina Hall, eighteen, was a freshman at Radford University. She lived in Radford with her older sister, Dlana, a graduate student, while both took summer courses. A number of witnesses testified to Gina's excellent reputation. She was described as "very beautiful," well dressed, pleasant, soft-spoken, and popular with her peers as well as with older people. She had close family ties. She particularly loved and respected her father, who said she was "a very, very good child." Gina was athletic and loved dancing. She was a church-goer, used alcohol very sparingly, and did not use drugs or tobacco. She had no serious psychological or physical problems and had never been away from home without permission. She was described as "a very happy person - never depressed."

Nevertheless, Gina was modest and self-conscious in her dress and in her physical relationships. This modesty was the result of an accident she had in early childhood. When Gina was two years old her pajamas caught fire from a gas stove and she was badly burned. She had many skin grafts at the University of Virginia Hospital and had permanent scars on her right side, abdomen, upper right arm, and right thigh. Gina dressed modestly because she was self-conscious about her scars. She covered herself with towels at the beach until she actually entered the surf. Dlana testified with reference to these scars, "She could not have handled the emotional stress of having a [physical] relationship with somebody and she never put herself in that situation." When Gina was ten, she had to return to the hospital for additional abdominal skin grafts because of the grafted skin's inability to stretch as she grew. She told her stepmother and sister that she was afraid that if she ever became pregnant her skin would be unable to stretch any further. Dlana testified that most of Gina's dates were "just friends," usually boys with whom she played tennis. She never "dated any slouch."

Gina was about five feet tall and weighed about 107 pounds. When she drove Dlana's car she had to move the seat so far forward that Dlana, who was four inches taller, could not get behind the wheel unless it was moved back again. The defendant is about six feet tall.

Both girls had been taking summer mid-term exams during the week of June 22-28, 1980. Gina finished her last exam on Saturday, June 28. She was in a "great mood" and wanted to go dancing at the Marriott in Blacksburg. Dlana was too tired to go, but

lent Gina her brown Chevrolet for the evening. Gina left about 10:00 p.m., wearing a white jacket and white high-waisted long trousers over a purple body suit with matching shoes. She wore an ankle bracelet of gold interlocked hearts. This was the only time that Dlana recalled in which Gina went out socially by herself. Dlana did not know whether Gina expected to meet anyone she knew at the Marriott. Dlana never saw her again.

Dlana had been asleep for some time when she was awakened by a call from Gina whose voice sounded "very uneasy [or] out of character —— very nervous." The court excluded the content of this conversation on the ground of hearsay, although the jury later learned the defendant's version of it through the defendant's statement to the police, which was admitted. The conversation lasted about two minutes. Dlana estimated the time at about 1:00 a.m. Gina has not been heard from since.

Bill King, twenty-seven, was a very close friend of the defendant, having known him since both were small children. King and the defendant planned to go to the Blacksburg Marriott for a "night out" on Saturday, June 28. King picked the defendant up in King's car about 10:00 p.m. They drove first to the home of King's mother and stepfather, Mr. and Mrs. Ronald Davis, on Claytor Lake, to see that it was secure. The Davises were away on vacation and had asked King to check the house occasionally since some vandalism had been occurring in the area. Finding the house in good order, King and the defendant drove to Blacksburg. They arrived at the Marriott about 11:00 p.m. and joined three friends, one of whom knew Gina.

Gina arrived at the Marriott at the same time. Although neither King nor the defendant knew her, the defendant danced with her four or five times. Later he asked King if he could borrow his car and the key to the house on the lake. King told him he was welcome to use the house, but that he couldn't let him have the car. The defendant asked Gina if they could take her car and she agreed. King testified, "She seemed to be confused as to what car was going and exactly who was going. I think when she came out she thought maybe I. . . ." Gina and the defendant left in the Chevrolet.

Later that night Robin Robinson and Bill King decided to go to the lake house for a swim. When they arrived at the house at 4:00 a.m., they observed that the brown Chevrolet was parked in the driveway, and that there were no lights on in the house. Wishing

to be discreet, King entered the house from the upper level, slammed the doors, and turned on the kitchen light. The defendant was in the den on a lower level. He called up the stairs, "Bill, is that you?" King did not see him, but called back, "I've got somebody with me and we're going down to the dock and go swimming." The defendant replied, "Well, we've got to leave." King said, "Well, that's O.K., you don't have to leave. Hang around . . . . We're just going swimming." The defendant said, "[S]he's got to be getting back." Robin looked down the stairs and saw the defendant, in trousers but shirtless, wiping his shoulders with a towel. Neither she nor King heard or saw any sign of Gina.

King and Robin went to the dock, where King remained while Robin went swimming for 15 or 20 minutes. While they were there, the defendant came out to the glass doors facing the lake, flashed the outside lights momentarily and called, "Bill, I'll see you later; we're leaving." There were no lights on indoors and neither King nor Robin heard or saw anyone else. They did not hear the car start and it was out of their view.

About five minutes later, King and Robin re-entered the house through the glass doors. Just inside, King, who was barefooted, stepped in a wet spot in the carpet. King pulled some cushions onto the floor, which he and Robin lay upon. Again, he noticed that his "foot was in something wet." He mentioned it to Robin; he thought it was water, and assumed that the defendant and Gina had been swimming and might have left wet clothing or towels there.

King drove Robin home about 10:00 a.m., Sunday, June 29. He picked up his four-year-old son, who had been visiting his grandmother, and returned to the Davis house on the lake about noon to take the child swimming. Shortly thereafter, the defendant arrived, alone, in his own car, followed by two other friends. King took the boy swimming while the others pitched horseshoes. The defendant was always welcome to use the house and was fully familiar with it. Nevertheless, he came down to the dock to ask King if he might go inside to get a drink. King told him to help himself. He thought the defendant remained inside an unusually long time and when he reappeared asked him, "Did you fall in a hole or something up there?" The defendant answered, "Well, I couldn't find an opener."

Some time before 7:00 a.m. on Sunday, June 29, a Pulaski County Deputy Sheriff, William Patton, observed the brown Chevrolet parked along the side of the Hazel Hollow Road, near a point where a railroad trestle crosses the New River into the City of Radford. The trunk was open. He was not concerned at the time since fishermen frequently park there, near the riverbank. He returned after midnight, in the early morning hours of June 30. The car was still there. Its trunk was still open and the driver's window was down. He checked the registration by radio. He was told it belonged to a party named Hall in Coeburn, Virginia, and was not reported stolen. He took no further action.

When Gina failed to appear by Sunday evening, Dlana called two friends, Robert Lent and Craig Runyan, who went in search of the car. They found it early Monday afternoon where Deputy Patton had seen it, near the trestle on Hazel Hollow Road. Runyan stayed with the car while Lent went into Radford to summon the police. Runyan noticed that there were empty plastic glasses, matches, and other trash in the car and that the door pull was ripped off on the driver's side. The driver's window was open and the seat was pushed all the way back. Runyan thought this strange since Gina was "a little girl." Dlana testified that the car had been clean, vacuumed, and freshly waxed when Gina left with it on June 28.

By Tuesday, July 1, "lookouts" for Gina were being broadcast on the local radio stations. King, hearing her description and that of the car, went to the defendant's place of employment and advised him to report the matter promptly so "they wouldn't think [he] had anything to hide." The defendant asked him whom he had told or who knew about it. King told him that there had been discussion of the matter at the weight-lifting club where they "worked out." The defendant asked King to "go back down there and tell them not to say anything, just kinda talk it down, not broadcast it."

Also on July 1st, before the police were certain that Gina was dead, the defendant had a conversation with William Cranwell, a close friend. He asked if Cranwell's brother, an attorney, might represent him. Cranwell thought not. Cranwell testified the defendant then requested, "[I]f and when I talked to my brother to ask him if there was anything that they could do to him if they didn't find a body." As they walked outside to the defendant's car, the defendant repeated this request. Cranwell was certain that the de-

fendant referred to "a body" or "the body," that it was not prompted by anything that Cranwell had said, and that the defendant was the only one who used the word.

On July 2, King discussed the case with the police and accompanied them back to the house on the lake. He found a broken ankle bracelet on the floor and gave it to the police. Dlana testified that the bracelet was similar to the one Gina wore. Mrs. Davis testified that she had never seen one like it in the house.

On July 5th, King had another discussion with the defendant. Referring to their conversation in the dark house on the lake, the defendant said, "[Y]ou did hear her, didn't you?" King answered that he had not heard Gina, and asked the defendant directly if he had killed her. The defendant replied, "Bill, I don't know anything about it . . . We'll just have to wait and see." The defendant never directly denied the killing. King asked him what had taken place between him and Gina. King testified that the defendant said, "a little fondling through the clothes, that's it." He said that he had gone swimming but that Gina had refused to join him.

King also testified that the defendant had abstained from alcohol for four years because he was "a little hyper" and was likely to get into fights if he had been drinking. He did not see him drink anything alcoholic on the night of June 28th.

When an investigator from the Radford police went over the Davis house carefully, minute bloodstains were found on the concrete driveway, on a walk in front of the glass doors facing the lake, on a light switch in the mid-level bathroom off the den, on the leg of a chair, on a pair of brown shoes, on a golf shoe, on a dust pan, on a mattock beside the refrigerator, and on the refrigerator door. The latter had been wiped nearly clean, but faint blood smears were visible, along with hairs and fibers. A hair was caught in a cleat of a golf shoe beside the refrigerator. There was a bloodstain on the inner refrigerator door gasket. A large bloodstain, about 18 inches in diameter, was found on the living room carpet just inside the glass doors. It had been partially cleaned up and was bleached out to a faint pinkish color. The police testified that these items would not have been apparent to a casual observer. Mrs. Davis testified that the house had been left very clean, and that there was no reason for the bloodstains to have been in the house before their departure.

Many volunteers joined in the search for Gina. A group of five friends from her home town, Coeburn, Virginia, discovered a blue

towel in heavy undergrowth ten feet from the railroad tracks, near the trestle. The towel bore bloodstains, and contained fibers identical to the carpet in the Davis living room. It was identified by Mrs. Davis as identical to a towel previously unused and missing from her home. Also missing from the house on the lake were an old blue and white towel, a roll of paper towels, a can of Dow bathroom cleaner with a green plastic cap, and a large handmade quilt. Mrs. Davis later found the green plastic cap by a trash can in the furnace room. She thought it strange for it to be there, and gave it to the police.

Sergeant Lovell of the Radford police found a shoe, later identified as one worn by Gina on June 28, on the Radford side of the river near the end of the trestle.

A group of high school students from Christiansburg found Mrs. Davis' blue and white striped towel in Radford between the New River Valley Shopping Plaza and the river. A short distance away they found all of the clothes Gina had worn on the night of the 28th, tied into a damp bundle and stained with blood. All of these items were turned over to the police.

On July 3, Sergeant Duffy of the Virginia State Police found the contents of Gina's purse concealed under a brush pile along the Hazel Hollow Road, ten feet off the highway. They were bunched together, not scattered. They included her checkbook, with its final entry dated June 28.

On July 1, Sergeant Hall of the Virginia State Police interviewed the defendant who said that he had driven Gina from the Marriott to the Davis house in her car and that as soon as they arrived she had called her sister. He said he overheard Gina tell Dlana that she was at the lake with a man named Steve, that she would not be out all night, and that she would be home in the morning. The defendant stated that they went to the dock where he went swimming but that Gina refused to join him; that they went to the house where they talked a few minutes, and that he "kissed her some." At this point, the defendant said that Gina told him she had once had a bad experience with a man and that she would have to know him very well before she could go to bed with him. He said that they then left the Davis house with Gina driving the Chevrolet. At his direction, he said, she drove him directly to his house in Radford where he got out, gave her directions to return to Dlana's apartment, and went inside to bed.

Dlana testified that Gina had driven around Radford long enough to know the area well, and would not have required any directions.

By July 2 the defendant had become a suspect. Sergeant Hall, after advising him of his rights, accused him of killing Gina. The defendant denied it. Hall repeated the accusation. The defendant was silent. Hall then advised the defendant to cooperate with him and told him to think of "how it [his cooperation] would affect the jury." The defendant said, "I'll think about it."[1]

Forensic scientists who qualified as experts in the comparison of hairs and fibers and in the biochemical analysis of bloodstains were furnished with the exhibits in the case, with known head and pubic hairs from the defendant, with head hairs taken from Gina's curlers, and with the recorded blood types of Gina and the defendant. All of the bloodstains taken from the Davis house which were capable of identification were found to be human blood, type "O." These included the stains found in the carpet, light switches, shoes, dust pan, and mattock. The last three items were spattered by tiny droplets, unlike the large drops which would fall from a cut finger, bleeding nose, or similar accidental injury. The cleat of the golf shoe contained a Caucasian pubic hair, unlike that of the defendant. No such hairs from Gina were available for comparison. However, imbedded in the blood smears on the refrigerator door, themselves too attenuated for analysis, were five head hairs identical to Gina's. The mat from the trunk of the Chevrolet contained type "O" bloodstains, head hairs identical to Gina's, and pubic hairs unlike the defendant's.

The blue towel found in the woods was stained with type "O" human blood, contained six head hairs identical to Gina's, two pubic hairs unlike the defendant's, and many synthetic fibers identical to those in the living room carpet in the Davis house. The green plastic cap from the can of Dow cleaner contained a hair identical to Gina's.

Gina's clothes had been exposed to the weather until they were found on July 19. They were found to be stained with blood but by that time it was impossible to determine its origin or type. Her jacket had bloodstains on the right breast and in the shoulder blade area in the back, spreading across the right side. The trou-

---

[1] Applying Rule 5:21, we do not notice defendant's argument that the officer's testimony was inadmissible.

sers also contained bloodstins, two head hairs identical to Gina's, and one head hair identical to those of the defendant.

Gina, as shown by her hospital records, had type "O" blood. The defendant has type "A" blood.

Synthetic fibers similar to those of the carpet in the Davis house were found in the trunk of the Chevrolet, on the refrigerator door, the blue towel, and Gina's clothing, including her panties.

John Preston, a retired Pennsylvania State Trooper, qualified as an expert in the training, handling, and "reading" of tracking dogs. The court required substantial foundation evidence outside the jury's presence before deciding to admit his testimony. Preston testified that he had performed tracking services and qualified as an expert witness in seventeen states, including Virginia, and in Puerto Rico. In this case, he worked with a male German Shepherd which had been used in over 150 criminal cases throughout the United States. The dog had successfully followed trails as old as twenty-one days. He had, in February 1978, followed an elderly man, missing for nine hours, through the streets of a town for seven blocks, finding him unconscious, despite three feet of snow. He testified that the dog's ability to distinguish human scent gradually diminished with the passage of time but that rain had no appreciable influence, and that wet conditions seemed actually to intensify the scent.

Preston and the dog arrived at Radford about midnight on July 10. Neither he nor the dog was familiar with the area and he was not told of the existence of a suspect. Sergeant Duffy took them to the place on Hazel Hollow Road where the Chevrolet had been found abandoned and the dog was "scented" on underwear taken from the defendant. The dog began a "casting search." Then, within 100 yards, he indicated that he had picked up the scent he was seeking. He left the road, ascended a path up the grade to the trestle and crossed the New River into Radford, following a walkway on the right side of the tracks. He followed a circuitous route through Radford, going to an area under Memorial Bridge on Route 11, retracing his steps along the tracks to a railroad switching area, going around a box factory, following a gravel path to a main thoroughfare, passing through the New River Valley Shopping Plaza, part of a twenty-four hour car wash, through other streets, across intersections, through a private lot and finally turned up a walkway to the front porch of a house. The dog walked up to the front door and stopped. At this point, Sergeant

Duffy informed Preston that the dog had come to the front door of the defendant's residence, and that the defendant was accused of Gina Hall's murder.

Gina's shoe, the two towels, and the bundle of her clothing had all been recovered at different previous times from several different places. The roundabout trail followed by the dog led the trackers closely past each of these locations. Preston testified that the dog's behavior indicated three lengthy "pauses" where the person tracked had lingered on the trail. The first of these was one-third of the way across the trestle over the river, the second was under the Memorial Bridge, and the third was in the railroad switching area.

On the following day, Preston spread out six blue towels of similar appearance in the Radford High School auditorium. Before the dog was admitted to the room he was again "scented" on the defendant's underwear. The dog ran immediately to the towel which had been found in the woods and refused to leave it until ordered to do so. Preston testified that this meant that the towel, in addition to any blood and fibers it contained, also had the same scent as that on the underwear.

On July 12, when the defendant was at the Radford Police Station in Captain Williams' office, Preston took the dog, which had not been inside, into the parking lot which contained numerous vehicles. After the dog had been "scented" on the same blue towel which had been found in the woods, he made a "casting search" through the parking lot until he came to the driver's door handle of the defendant's parked car. After pausing there, he "tracked" into the police station, coming directly to the door of the office in which the defendant was seated. When informed of the dog's performance on these three occasions, the defendant put his head down on his arms and said, "That's a damn good dog." He repeated this remark three times.

## CORPUS DELICTI

The court instructed the jury that the Commonwealth must first prove that Gina was dead and that her death was caused by criminal violence. The instruction told the jury that these elements might be proved "either by direct evidence or by proof so strong as to produce the full assurance of moral certainty." Defendant agrees that this instruction correctly states the law, but argues

that the evidence was insufficient to warrant the jury's finding the existence of the *corpus delicti*.

Sir Matthew Hale wrote, "I would never convict any person of murder or manslaughter, unless the fact were proven to be done, or at least the body found dead . . .", 2 M. Hale, *Pleas of the Crown* 290 (1736). Many later writers have misconstrued this dictum to mean that there can be no conviction unless the prosecution produces the body of the victim. This may account for the familiar layman's misconception which equates "*corpus delicti*" with the body of the victim. This is not the law of England today, and probably never was. *Regina* v. *Onufrejczyk,* [1955] 1 Q.B. 388.

Conceding that the *corpus delicti* may be proved circumstantially, defendant argues that in the absence of the body, such proof can only be held sufficient where: (1) there is an eyewitness to the killing, (2) some identifiable remains of the victim are found, or (3) the accused confesses the crime or makes admissions which corroborate the circumstantial proof of violent death.

We are not persuaded that any such limitations should be imposed. When the evidence is circumstantial, the standard of proof is stringent. The jury was properly so instructed in this case. Such a requirement of strictness sufficiently protects the defendant from guesswork and speculation. It is unnecessary to create artificial rules as to the species of circumstantial evidence which the jury may consider. Circumstantial evidence comes in infinite variety. Because it is not subject to the human frailties of perception, memory, and truthful recital, it is often more reliable than the accounts of eyewitnesses. When convincing, it is entitled to the same weight as direct testimony. *Stamper* v. *Commonwealth,* 220 Va. 260, 272, 257 S.E.2d 808, 817 (1979); *Turner* v. *Commonwealth,* 218 Va. 141, 145-46, 235 S.E.2d 357, 360 (1977).

As Lord Goddard points out in *Regina* v. *Onufrejczyk, supra* at 396, there is less reason for strictness in the proof of *corpus delicti* now than in earlier times. In Sir Matthew Hale's day, a person might disappear beyond all possibility of communication by going overseas or by embarking in a ship. It would have been most dangerous to infer death merely from his disappearance. Worldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person, in view of his health, habits, disposition, and personal relationships would voluntarily flee, "go underground,"

and remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence.

Further, the restrictions on proof which the defendant advocates would place a premium on stealthy murder and successful concealment of the victim's body. Among the numerous atrocities of which Charles Manson was convicted in California in the 1970's was the murder of Shea, whose body was never found. The California Court of Appeal remarked:

> The fact that Shea's body was never recovered would justify an inference by the jury that death was caused by a criminal agency. It is highly unlikely that a person who dies from natural causes will successfully dispose of his own body. Although such a result may be a theoretical possibility, it is contrary to the normal course of human affairs.
>
> The fact that a murderer may successfully dispose of the body of the victim does not entitle him to an acquittal. That is one form of success for which society has no reward.

*People* v. *Manson,* 71 Cal. App.3d 1, 42, 139 Cal. Rptr. 275, 298 (1977), *cert. denied,* 435 U.S. 953 (1978).

Courts in other jurisdictions, confronted with those infrequent homicide cases in which the victims' bodies were never found, have reached similar conclusions. *See, e.g., People* v. *Scott,* 176 Cal. App.2d 458, 1 Cal. Rptr. 600 (1959), appeal dismissed and *cert. denied,* 364 U.S. 471 (1960); *People* v. *Cullen,* 37 Cal. 2d 614, 624, 234 P.2d 1, 16 (1951); *State* v. *Pyle,* 216 Kan. 423, 532 P.2d 1309 (1975); *Commonwealth* v. *Burns,* 409 Pa. 619, 187 A.2d 552 (1963); *Kugadt* v. *State,* 38 Tex. Crim. 681, 44 S.W. 989 (1898); *Regina* v. *Onufrejczyk, supra; The King* v. *Horry,* [1952] N.Z.L.R. 111.

In homicide cases, the *corpus delicti* must consist of proof (1) of the victim's death, and (2) that it resulted from the criminal act or agency of another. *Clark* v. *Commonwealth,* 220 Va. 201, 257 S.E.2d 784 (1979). Although this is the first such case to come to this Court in which the victim's body was not found, we have long held that the *corpus delicti* may be proven by circumstantial evidence. *Lane* v. *Commonwealth,* 219 Va. 509, 514, 248 S.E.2d 781, 783 (1978); *Bowie* v. *Commonwealth,* 184 Va. 381,

35 S.E.2d 345 (1945); *Cochran* v. *Commonwealth,* 122 Va. 801, 94 S.E. 329 (1917).

We think the evidence was sufficient to warrant the jury in finding, to the full assurance of moral certainty, that Gina Hall was dead as the result of the criminal act of another person. The jury was entitled to take into account, in this connection, her sudden disappearance, her character and personal relationships, her physical and mental health, the evidence of a violent struggle at the house on Claytor Lake, her hidden, blood-soaked clothing, and the defendant's incriminating statements - particularly his reference to "the body" before it was generally thought she was dead.

### EVIDENCE OF VICTIM'S CHARACTER

The defendant assigns error to the trial court's admission of the abundant evidence, summarized in the first part of this opinion, concerning Gina's character, traits, habits, and relationships. It is true that the Commonwealth may not ordinarily, in its case in chief, offer evidence of the good character and peaceable nature of the deceased. *Thomason* v. *Commonwealth,* 178 Va. 489, 17 S.E.2d 374 (1941). Here, however, the Commonwealth had the burden of proving by circumstantial evidence that Gina was dead as a result of the criminal act of another. The evidence must be such as to foreclose every reasonable hypothesis of innocence, including suicide, natural death, accidental death, justifiable or excusable homicide, or continuing life *in absentia.* The evidence objected to was relevant to negate these theories. It showed the unlikelihood that Gina would take her own life, flee, or fall victim to accidental death because of some dangerous habit or practice.

Every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue, is admissible. *Stamper* v. *Commonwealth, supra,* at 269, 257 S.E.2d at 815. The admission of similar evidence for the same purpose was approved in California in *People* v. *Scott, supra,* in Kansas in *State* v. *Pyle, supra,* and in Pennsylvania in *Commonwealth* v. *Burns, supra.* We find no error in its admission as part of the circumstantial evidence tending to prove the *corpus delicti.*

### PREMEDITATION AND DELIBERATION

The defendant contends that the evidence was insufficient to support the jury's finding of the premeditation and deliberation

requisite for a conviction of first degree murder. The jury was correctly instructed as to the elements of first degree and second degree murder, and the terms "willful, deliberate, and premeditated" and "malice," as used in the instructions, were properly defined. The defense made no objection to the instructions on the degrees of murder. Neither party requested an instruction as to the lesser included offense of voluntary manslaughter, and none was given. In oral argument on appeal, the defendant conceded that if the proof of *corpus delicti* were sufficient, there would have been evidence sufficient to support a verdict finding the defendant guilty of voluntary manslaughter.

In accordance with our decisions, the jury was instructed that "malice is implied by law from any willful, deliberate and cruel act against another, however sudden." The spattering of tiny droplets of blood through two rooms, the bloodstained clothing, the broken ankle bracelet, the large bloodstain on the carpet, and the disparity of size and strength between Gina and the defendant are all circumstances from which the jury could properly infer that she was subjected to a savage beating, resulting in death. This would readily support a finding of the malice requisite for a conviction of second degree murder.

The defendant argues correctly that premeditation and deliberation, which the Commonwealth must prove beyond a reasonable doubt to obtain a first degree murder conviction, require the adoption of a specific intent to kill, which is something more than malice. *Smith* v. *Commonwealth,* 220 Va. 696, 261 S.E.2d 550 (1980). "The intent to kill must come into existence at some time before the killing; it need not exist for any particular length of time." *Id.* at 700, 261 S.E.2d at 553. "[I]t is necessary that the killing should have been done on purpose, and not by accident, or without design. . . ." *McDaniel* v. *Commonwealth,* 77 Va. 281, 284 (1883). "The exact state of the defendant's mind at the time of the killing is the crucial factor in determining intent. 'It is the will and purpose to kill, not necessarily the interval of time, which determine the grade of the offense.'" *Smith, supra,* at 700-01, 261 S.E.2d at 553. "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Giarratano* v. *Commonwealth,* 220 Va. 1064, 1074, 266 S.E.2d 94, 100 (1980).

The jury was justified in finding from the evidence that the defendant, knowing that there would be no one else at the Davis

home on the night of June 28-29, persuaded Gina to go there with him by leading her to believe others would be present; that his original intention was to have sexual intercourse with her, but that she rebuffed his advances; that he attempted to take her by force, removing her outer clothing and breaking her ankle bracelet in the process; that the struggle became so violent that he realized she was a potential witness against him on a charge of sexual assault; that he thereupon resolved to silence her permanently, to hide her body, to dispose of the evidence, and to escape detection.

The question whether premeditation and deliberation exist, so as to elevate a homicide to first degree murder, is in the province of the jury. *Hodges v. Commonwealth,* 213 Va. 316, 191 S.E.2d 794 (1972). In deciding it, the jury may properly consider the brutality of the attack, and whether more than one blow was struck, *Jackson v. Virginia,* 443 U.S. 307, 325 (1979); the disparity in size and strength between the defendant and the victim, *State v. LaChance,* 524 S.W.2d 933 (Tenn. 1975); the concealment of the victim's body, *State v. Austin,* 52 Ohio App.2d 59, 368 N.E.2d 59 (1976); and the defendant's lack of remorse and efforts to avoid detection, *Smith v. Commonwealth, supra.* While motive is not an essential element of the crime, it is relevant and often most persuasive upon the question of the actor's intent. *Smith, Id.; Ward v. Commonwealth,* 205 Va. 564. 138 S.E.2d 293 (1964). While none of these factors might be sufficient standing alone, in combination they are more than enough to support the jury's finding that the killing of Gina Hall was not only malicious, but also willful, deliberate, and premeditated. All of the defendant's conduct after Gina's disappearance is consistent with the continuing execution of a scheme, adopted before her death, to dispose of her furtively, permanently, and with impunity.

## *DOG TRACKING*

The defendant assigns error to the admission of the dog-tracking evidence. Although a question of first impression in Virginia,[2] many courts elsewhere have considered the admissibility of such evidence, beginning with *Hodge v. State,* 98 Ala. 10, 13 So. 385 (1893). An excellent summary of the development of this area of the law was written by Judge Thompson, who calls it "[a] very

---

[2] No error was assigned to the admission of evidence of this kind in *Noell v. Angle,* 217 Va. 656, 231 S.E.2d 330 (1977).

colorful page of American folklore," in *Terrell v. State,* 3 Md. App. 340, 344, 239 A.2d 128, 130 (1967). *See also* Annot., 18 A.L.R.3d 1221 (1968).

Although a few jurisdictions exclude such evidence generally, and some require proof that the dog is a "purebred bloodhound," a substantial majority of jurisdictions admit such evidence after the trial judge is satisfied that a proper foundation has been laid. Thereafter, objections on such grounds as the staleness and contamination of the trail due to lapse of time, precipitation or other traffic, as well as matters such as the relative inexperience of dog or handler, go only to the weight which the jury should give to the result. *See, e.g., State v. Harris,* 25 Or. App. 71, 547 P.2d 1394 (1976).

We hold that dog-tracking evidence is admissible in a criminal case after a proper foundation has been laid to show that the handler was qualified to work with the dog and to interpret its responses, that the dog was a sufficiently trained and proven tracker of human scent, that the dog was placed on the trail where circumstances indicated that the guilty party had been, and that the trail had not become so stale or contaminated as to be beyond the dog's tracking capabilities.

John Preston's testimony furnished a strong foundation for the admission of the evidence. His qualifications and the dog's training and abilities were fully developed. The dog was placed on the track at a point where other evidence showed that the perpetrator had been. The trail was eleven days old and had been subjected to considerable rainfall, but the foundation testimony showed that the dog had successfully followed older trails and had succeeded despite far worse atmospheric conditions. In the actual event, the dog unerringly followed the trail past the various points where the victim's clothing and the bloodstained towel had been hidden, and came to the defendant's front door. The factors of staleness and contamination of the trail were properly submitted to the jury's consideration in connection with the weight to be given to Preston's testimony. There was no error in the admission of the evidence.

### ADDITIONAL ASSIGNMENTS OF ERROR

The defendant assigns three additional errors:

(1) In the cross-examination of Captain Williams, by defense counsel, the following testimony was given:

Q. "You went down there and talked to him [the defendant] before you went out to the cabin?"
A. "Yes, sir."

\* \* \* \* \* \* \* \* \*

Q. "And what discussions did you have at that time?"
A. "In reference to taking a polygraph."
Q. "What happened after that, did you see him anymore that day?"
A. "I don't recall seeing him anymore until later that night."

After Williams was excused and after two more witnesses had testified and were excused, defense counsel moved for a mistrial because of the mention of the word "polygraph." The trial judge concluded that the answer had been inadvertently elicited by defense counsel and that in the context of which it was used, without definition or elaboration, it was harmless. We agree.

■ (2) On the fourth day of trial the defendant wrote a letter to the judge requesting that his counsel be relieved, and moving for a mistrial and the appointment of new counsel. The court denied the motion, noting that defense counsel had been giving him "an energetic and effective representation." We agree.

■ (3) The court denied a pre-trial motion for change of venue based on extensive local publicity. The court ruled that an effort would be made to impanel an unbiased Pulaski County jury, but if twenty veniremen free from exception could not be found, the court would reconsider the motion for change of venue. After a lengthy and careful voir dire, a panel of twenty was drawn which was free from exception. The motion was thus rendered moot and was not renewed.

We find no reversible error in the record and will affirm the judgment.

*Affirmed.*